Robert J. Gralewski, Jr. (#196410)
Kirby McInerney LLP
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 398-4340
Email: bgralewski@kmllp.com

*Counsel for Lead Plaintiff Eric Blackwell*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KETANKUMAR SHAH, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> A10 NETWORKS, INC., LEE CHEN, GREG STRAUGHN, SHIVA NATARAJAN, and TOM CONSTANTINO, <br><br> Defendants. | Case No. 3:18-cv-01772-VC <br><br> **AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ............................................................................. 1

II.   JURISDICTION AND VENUE ...................................................................... 10

III.  PARTIES ....................................................................................................... 10

      A.    Plaintiffs ............................................................................................ 10

      B.    Defendants ......................................................................................... 11

IV.   FACTUAL BACKGROUND ......................................................................... 12

      A.    A10's Business ................................................................................... 12

      B.    A10's Financial Results were Materially Misleading and Violated Applicable
            GAAP, SEC Rules, and Its Own Stated Policies .............................. 21

      C.    The Company's Violation of Disclosure Obligations Imposed by GAAP
            and SEC Regulations ........................................................................ 25

V.    DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS DURING
      THE CLASS PERIOD ................................................................................... 36

      A.    False and Misleading Statements in the February 9, 2016 Fourth Quarter
            and Year-End 2015 Earnings Press Release and Conference Call .............. 36

      B.    False and Misleading Statements in the 2015 Annual Report ................... 38

      C.    False and Misleading Statements in the April 28, 2016 First Quarter 2016
            Earnings Press Release and Conference Call ................................. 43

      D.    False and Misleading Statements in the First Quarter 2016 Form 10-Q .......... 44

      E.    False and Misleading Statements in the July 28, 2016 Second Quarter 2016
            Earnings Press Release and Conference Call ................................. 46

      F.    False and Misleading Statements in the Second Quarter 2016 Form 10-Q .......... 48

      G.    False and Misleading Statements in the October 27, 2016 Third Quarter
            2016 Earnings Press Release and Conference Call ........................ 51

      H.    False and Misleading Statements in the Third Quarter 2016 Form 10-Q .......... 54

      I.    False and Misleading Statements in the February 9, 2017 Fourth Quarter
            and Year-End 2016 Earnings Press Release and Conference Call .............. 57

      J.    False and Misleading Statements in the 2016 Annual Report ................... 60

      K.    False and Misleading Statements in the April 27, 2017 First Quarter
            2017 Earnings Press Release and Conference Call ........................ 64

      L.    False and Misleading Statements in the First Quarter 2017 Form 10-Q .......... 65

VI.   THE TRUTH BEGINS TO EMERGE THROUGH PARTIAL CORRECTIVE
      DISCLOSURES WHILE DEFENDANTS CONTINUE TO ISSUE FALSE AND
      MISLEADING STATEMENTS ...................................................................................67

      A.   False and Misleading Statements in the July 13, 2017 Preliminary
           Second Quarter 2017 Earnings Press Release .................................................67

      B.   False and Misleading Statements in the July 27, 2017 Second Quarter 2017
           Earnings Press Release and Conference Call ..................................................69

      C.   False and Misleading Statements in the Second Quarter 2017 Form 10-Q .............71

      D.   False and Misleading Statements in the September 28, 2017 Preliminary
           Third Quarter Earnings Press Release .............................................................74

      E.   False and Misleading Statements in the October 26, 2017 Third Quarter
           2017 Earnings Press Release and Conference Call ..........................................75

      F.   False and Misleading Statements in the Third Quarter 2017 Form 10-Q .............77

      G.   False and Misleading Statements in the January 16, 2018 Preliminary
           Fourth Quarter and Year-End 2017 Earnings Press Release ...........................80

VII.  THE TRUTH IS REVEALED .............................................................................81

VIII. LOSS CAUSATION ...........................................................................................82

      A.   The July 13, 2017 Partial Disclosure ..............................................................83

      B.   The January 16, 2018 Partial Disclosure ........................................................84

      C.   The January 30, 2018 Corrective Disclosure ..................................................85

IX.   ADDITIONAL FACTUAL ALLEGATIONS FURTHER SUPPORTING
      SCIENTER .........................................................................................................87

      A.   The Individual Defendants' Hands-On Involvement in A10's
           "Core Operations" During the Class Period ...................................................87

      B.   Executive Turnover .........................................................................................96

      C.   Individual Defendants' Accounting Expertise ................................................97

      D.   A10 and Individual Defendants Failed to Maintain Effective Controls....................99

      E.   A10's Code of Business Conduct and Ethics and Financial Reporting
           Obligations of Senior Officers......................................................................106

      F.   Corporate Scienter ........................................................................................108

X.    POST-CLASS PERIOD DISCLSOURES .........................................................108

XI.   CLASS ACTION ALLEGATIONS...................................................................110

XII.   APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND
       *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE ......................................111

XIII.  NO SAFE HARBOR ............................................................................................113

XIV.   COUNTS .............................................................................................................113

XV.    PRAYER FOR RELIEF ......................................................................................117

XVI.   JURY TRIAL DEMANDED ...............................................................................117

Court-appointed Lead Plaintiff Eric Blackwell ("Lead Plaintiff" or "Blackwell") and Additional Plaintiff Robert Kraszewski ("Additional Plaintiff" or "Kraszewski") (collectively, "Plaintiffs"), by and through their attorneys, allege the following against Defendants A10 Networks, Inc. ("A10" or the "Company"), A10's founder and Chief Executive Officer ("CEO") Lee Chen ("Chen"), A10's former Chief Financial Officer ("CFO") Greg Straughn ("Straughn"), A10's former interim CFO Shiva Natarajan ("Natarajan"), A10's current CFO Tom Constantino ("Constantino"), and Ray Smets ("Smets"), A10's former Executive Vice President ("EVP") of Worldwide Sales.  Plaintiffs' allegations concerning their own transactions are based upon their individual personal knowledge.  All other allegations are based upon Plaintiffs' counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by A10 with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and media reports issued and disseminated by A10; and (c) review of other publicly available information concerning A10, including reports on A10 authored by securities analysts.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action against A10 and certain of its officers for violations of the federal securities laws.  Plaintiffs bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, on behalf of itself and all similarly situated purchasers of A10 securities during the period from February 9, 2016 through January 30, 2018, both dates inclusive (the "Class Period").

2.    A10, a publicly-traded Delaware corporation headquartered in San Jose, California, provides software and hardware solutions in the United States and internationally.  A10's securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "ATEN."  A10 is a Secure Application Services™ company, that offers a range of high-performance application networking solutions that help organizations ensure that their data center applications and networks remain highly available, accelerated and secure.

3.      During the Class Period, Defendants fraudulently disseminated numerous financial statements that reported artificially inflated revenue and earnings.  Defendants employed these materially false financial statements for the purpose of managing A10's quarterly revenue and earnings to satisfy market expectations and present the illusion of consistent financial performance.

4.      Finally dispelling that illusion, on January 30, 2018, A10 issued a press release announcing that it was postponing its Q4'17 and full year earnings release and conference call because its Audit Committee and outside counsel were conducting an investigation into the Company's revenue recognition practices from the fourth quarter of 2015 through the fourth quarter of 2017, inclusive, as well as reviewing its internal controls.  On August 29, 2018, A10 filed its Form 10-K (the "Restatement 10-K") with the SEC which contained a restatement (the "Restatement"), confirming that its Annual Report on Forms 10-K for the fiscal years ended December 31, 2015 and December 31, 2016, and the Quarterly Report on Forms 10-Q for each quarter from the quarters ended March 31, 2016 through September 30, 2017 were materially false.

5.      The Restatement was an admission that A10's previously-issued financial results were materially inaccurate.  The Restatement also revealed to the investing public the likelihood that the Company had been improperly recognizing revenue when payment was contingent on resale and/or the transactions included extended payment terms beyond the Company's customary terms, consistent with a practice of channel stuffing.  During the Class Period, these accounting violations allowed the Company to exceed revenue expectations, and to maintain the illusion that it had reversed a trend of non-GAAP operating losses and had reached non-GAAP profitability in Q3'16 and was increasingly profitable in Q4'16.[1]  To the contrary, the Restatement indicated that: (i) Q4'15 revenues had in fact missed the consensus expectations at a time when the market was questioning whether the Company was sufficiently diversified to weather a decline in enterprise IT spending; (ii) the Company had not successfully reached its goal of non-GAAP profitability and

---

[1] "GAAP" refers to Generally Accepted Accounting Principles in the United States of America.

non-GAAP EPS did not breakeven in Q3'16;[2] but instead, continued operating at a non-GAAP loss; and (iii) the Company continued operating at a non-GAAP net loss in Q4'16, revenues were below consensus guidance rather than at the midpoint, and product revenues were improperly inflated by $3 million, more than 5%.

| NON-GAAP Financial Measures ($M, except EPS) | Q1'16 | Q2'16 | Q3'16 | Q4'16 |
|---|---|---|---|---|
| Operating Income (Loss) – As Previously Reported | $(4.0) | $(1.9) | $0.3 | $4.7 |
| Net loss – As Previously Reported | $(4.1) | $(1.1) | $0.2 | $2.3 |
| Net income (loss) per share – As Previously Reported | $(0.06) | ($0.02) | $0.00 | $0.03 |
| Operating Income (Loss) – As Restated | $(2.9) | $(1.3) | $(0.23) | $2.1 |
| Net Loss – As Restated | $(3.1) | $(.5) | $(0.37) | $(0.26) |
| Net income (loss) per share – As Restated | $(0.05) | $(0.01) | $(0.01) | $(0.00) |

6.      Pursuant to GAAP and SEC guidance, revenue cannot be properly recognized if the fee is not fixed or determinable or if collectibility is not reasonably assured.  Defendants have admitted that A10 improperly recognized revenue during the Class Period when the price was not fixed or determinable and for which collectibility was not reasonably assured because:

(i)      During the year ended December 31, 2015,[3] revenue on certain sale transactions was recognized prematurely, as it was determined that there was an oversight of facts that indicated collectability was not reasonably assured, because the reseller's or distributor's payment to the Company was contingent on resale of the product or the transaction included extended payment terms beyond the Company's customary terms.

(ii)     During the year ended December 31, 2016, revenue was recognized prematurely at the time, as it was determined that there was an oversight or misuse of facts which indicated that the reseller's or distributor's price was not fixed or determinable, or that collectability was not reasonably assured, because the reseller's or distributor's payment to the Company was contingent on resale of the product or the transaction included extended payment terms beyond the Company's customary terms.

7.      For Q4'15, the adjustment reduced total revenue by more than $2.6 million, whereas the Company had previously reported exceeding consensus by $2.2 million, thus indicating that the

---

[2] The announcement that A10 achieved non-GAAP profitability offset the negative disclosure that the it missed Q3'16 revenue guidance, which resulted in the stock price declining 17%.

[3] The Company stated in its Restatement 10-K that the investigation "principally focused on certain revenue recognition matters from the fourth quarter of 2015 through the fourth quarter of 2017 inclusive," and since the Restatement 10-K does not provide quarterly data for 2015 errors, Plaintiffs must assume that the FY'15 errors were in Q4'15.

Company failed to meet expectations.  For Q3'16, the Company initially reported it had achieved non-GAAP net income of $0.2 M or break even on a per share basis, compared with a loss of $0.07 per share in last year's third quarter, yet the Restatement showed the Company was operating at a non-GAAP net loss and had negative non-GAAP net income per share.  For Q4'16, A10 reported quarterly revenue of $64 million, exceeding consensus estimates by 5%, yet the restated revenue was below the $61 million consensus.  Further, the Company's Q4'16 non-GAAP net income of $2.3 million was restated to a loss of $0.3 million, and non-GAAP EPS went from $0.03, which was above the midpoint of the Company's guidance, to $0.00, at the bottom of the guidance range.

8.     Importantly, A10 has admitted that in 2015 "revenue on certain sale transactions was recognized prematurely" and "collectability was not reasonably assured."  The Company also admitted that in 2016 "revenue was recognized prematurely at the time" because "the reseller's or distributor's price was not fixed or determinable," or that "collectability was not reasonably assured."  Further, Plaintiffs allege numerous additional facts that raise a strong inference that Defendants intentionally or recklessly misstated A10's financial results in violation of GAAP and the Exchange Act.

9.     A10's core business was highly concentrated, with purchases from its ten largest customers accounting for approximately 32% of revenue in 2015, 36% of revenue in 2016, and 35% of revenue in 2017.  In addition, during 2016, a single distribution channel partner accounted for 14% of A10's total revenue.  Because of this concentrated customer base, A10's senior management was able to closely monitor its business.

10.     During the Class Period, the Individual Defendants (defined herein), including Chen, consistently provided detailed guidance regarding current period and projected customer purchases and revenue recognition during earnings calls.  In addition, A10 described Chen as the Company's "chief operating decision maker" and noted that, in addition to his operational responsibilities, conducted in-depth reviews of the Company's financial performance.

11.     On the Company's FY'16 earnings call held on February 9, 2017, it was announced that Straughn, the Company's CFO, had resigned which was effective upon the filing of the Company's Form 10-K, although Straughn would remain with the Company until April 2017.

Natarajan, A10's Vice President and Controller, was appointed interim CFO effective upon the effectiveness of Straughn's resignation until A10 found a replacement.  In June 2017, Constantino took over the role as CFO.  Shortly after, the Company announced its Q2'17 results, indicating it had missed its guidance due to 12 deals being pushed out.  In a press release issued July 27, 2017 discussing Q2'17 financial results, Chen stated, "We are disappointed with our second quarter results as a number of opportunities in our pipeline did not close in the quarter, which impacted our revenue.  We are implementing a number of cross-functional actions to improve our execution, increase the effectiveness of our go-to-market activities and support growth for our expanding product portfolio."

12.      Constantino reportedly conducted a thorough review of A10's processes and put in place improved sales enablement processes to improve pipeline execution and weekly sales committee meetings.  Shortly after, in September 2017, the Company announced the departure of Smets, EVP of Worldwide Sales, who had been with the Company since 2013 and was a member of A10's six-person Executive Team.  Constantino assumed oversight of Worldwide Sales following Smets' departure, on an interim basis.

13.      On January 30, 2018, A10 announced that it was postponing of its financial results for Q4'17 and FY 2017 because "the Company determined that a mid-level employee within its finance department had violated the Company's Insider Trading Policy and Code of Conduct," and, as a result, its Audit Committee and outside counsel "determined that further review and procedures relating to certain accounting and internal control matters should be undertaken."  The Company further disclosed that the investigation was "principally focused on certain revenue recognition matters from the fourth quarter of 2015 through the fourth quarter of 2017 inclusive."  In reaction to the January 30, 2018 announcement, during the next trading day, A10's share priced declined 12%, erasing millions of dollars of shareholder value.

14.      On July 2, 2018, the Company issued a press release announcing that the internal investigation was complete and "errors in the company's financial statements were identified relating to the recognition of revenue in a limited number of sale transactions between the company and its resellers."  It went on to explain: "The principal factors that contributed to the company

*prematurely recognizing revenue on these transactions were incorrect assessment of resellers' ability or intent to pay the company before they received a purchase order or payment from their end customers*, and some of the facts and circumstances of certain transactions not being fully communicated to accounting personnel at the time of the transaction."[4]  The press release went on to state that A10's "Annual Report on Form 10-K for the fiscal year ended December 31, 2016, and its condensed consolidated financial statements contained in its Quarterly Report on Forms 10-Q for the quarters ended September 30, 2016 and March 31, 2017 should no longer be relied upon and should be restated."

15.    The press release also indicated that the Company expected to report one or more material weaknesses in internal control over financial reporting related to this matter and that its disclosure controls and procedures were not effective.   Nevertheless, it asserted that "The company's Board of Directors continues to have the utmost confidence in the company's current officers, none of whom were implicated in any misconduct or caused any of the errors identified in the investigation.  The Audit Committee notes management's assistance and helpful cooperation with all aspects of the investigation."  This finding is directly contradicted by the finding that management failed to maintain adequate internal controls.

16.    Nearly seven months later, after an extensive investigation, the full extent of Defendants' accounting fraud was disclosed to the market on August 29, 2018, when A10 finally issued its restated financial statements.  The Restatement 10-K stated, "our Chief Executive Officer and Chief Financial Officer, as our principal executive officer and principal financial officer, respectively, concluded that our disclosure controls and procedures were not effective as of December 31, 2017, due to the material weaknesses in our internal controls over financial reporting."  It noted, "Our internal control over financial reporting is designed by, and under the supervision of our principal executive officer and principal financial officer and effected by the Company's Board of Directors, management, and others."

17.    The Restatement 10-K detailed the material weaknesses identified:

---

[4] All emphasis is added unless otherwise noted herein.

*Control Environment and Monitoring Activities* - We did not maintain an effective control environment.

Specifically, our control environment, which sets the tone of our organization, and influences the control consciousness of employees, *did not consistently ensure that the Company's policies relating to revenue recognition and standards of conduct were affirmatively understood and followed and that deviations therefrom were consistently identified and corrected in a timely manner or hold certain individuals accountable for their internal control responsibilities in the pursuit of Company objectives*. Further, at certain levels within certain functions, there were *insufficient monitoring activities* to determine certain components of internal control were present and functioning.

The control environment material weaknesses contributed to the revenue recognition material weaknesses described below.

*Revenue Recognition* - We identified the following material weaknesses with respect to revenue recognition:
- *Certain personnel in our credit and accounting functions did not have the adequate expertise* to design and operate certain internal controls, to formalize certain appropriate policies and procedures, or to communicate matters relevant to revenue recognition. *Certain personnel in our sales and sales operations functions did not have the adequate expertise* to identify and communicate to accounting personnel certain information relevant to revenue recognition.
- *Certain policies and procedures were not sufficiently detailed* to establish expectations for and to support effective design and operation of internal controls in our sales, credit, and accounting functions to consistently determine whether our reseller's or distributor's *price was fixed or determinable*, or that *collectability was reasonably assured* in every case, and that once determined, *adequate documentation was maintained*.

The material weaknesses described above resulted in errors that led to the restatement of the Company's annual consolidated financial statements for the years ended December 31, 2016 and 2015. Furthermore, these control deficiencies could have resulted in other misstatements in financial statement accounts and disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that might not have been prevented or detected.

18.     As admitted by the Company, Individual Defendants Chen, Straughn, Natarajan, and Constantino were responsible for ensuring that the Company maintained adequate internal controls.  The weaknesses identified above clearly reflect their failure to do so.  It is management's duty to maintain an effective control environment and to set the tone for the organization, and as admitted, the Individual Defendants failure to do so resulted in the revenue recognition material

weakness.   The Individual Defendants were responsible for ensuring the Company's policies relating to revenue recognition and standards of conduct were understood and followed, as well as, ensuring that sufficient monitoring activities were in place.   Additionally, the Individual Defendants were responsible for ensuring personnel had adequate expertise and, critically, that effective policies and procedures were in place to determine whether a reseller's or distributor's price was fixed or determinable, that collectability was reasonably assured, and that adequate documentation was maintained.

19.   The Restatement 10-K also detailed various remediation actions taken to address these material weaknesses, further reflecting the Individual Defendants failure to implement and maintain adequate internal controls during the Class Period:

- *Executive Management Communications to Reinforce Compliance* - The Company's Chief Executive Officer and Chief Financial Officer, at the direction of the Company's Board of Directors, have in communications to personnel reinforced the importance of adherence to the Company's policies and procedures regarding ethics and compliance and the importance of identifying misconduct and raising and communicating concerns.
- *Changes to Our Executive Management and Sales Personnel* - The Company has hired new personnel, who have enabled improved lines of communication across business functions and increased expertise.
- *Training Practices* - The Company has initiated development of a comprehensive training program relating to revenue recognition and contract review.
- *Credit Policies and Procedures* - The Company has evaluated its practices regarding extension of credit to customers and evaluation of customer creditworthiness and has begun implementing improvements in those practices.
- *Revenue Recognition Policies and Procedures* - The Company has evaluated its revenue recognition policies and procedures and has begun implementing improvements, including:

  (i)    the development of more comprehensive revenue recognition policies and improved procedures to ensure that such policies are understood and consistently applied;

  (ii)   better communication among functions involved in the sales process, including credit, accounting, sales, and sales operations;

  (iii)  increased standardization of contract documentation and revenue analyses for individual transactions, including increased oversight of revenue opportunities and contract review by personnel with the requisite accounting knowledge;

  (iv)   the development of a more comprehensive review process for, and monitoring controls over, customer contracts to ensure accurate revenue

recognition, and the preparation of accounting memoranda to document the foregoing;

(v)      the development of more comprehensive policies and procedures for product shipment and delivery documentation;

(vi)      the adoption of enhancements of policies and procedures for approval of non-standard revenue arrangements with reseller and distributor customers; and

(vii)      the adoption of revised documentation, including the Company's sales quotations, to identify additional information relevant to revenue recognition.

- *Implementation and Enhancement of Entity Level Controls* - The Company intends to implement additional controls in its quarterly/annual financial reporting process, including enhanced sub-certifications by all sales personnel and with specific documentation related to the identification of nonstandard revenue arrangements.  The Company also intends to enhance its insider trading policy and related communications to employees.

20.      Executive turnover during the Class Period indicates that the Company terminated multiple executives whose positions suggest their responsibility for the revenue recognition and internal control issues later admitted.

21.      The Restatement 10-K disclosed that in March 2018, the SEC began a private investigation into any securities law violations by A10 or persons currently or formerly affiliated with A10, including possible violations of the following:

- Section 17(a) of the Securities Act of 1933;

- Section 10(b) of the Securities and Exchange Act of 1934;

- Section 13(a) of the Securities and Exchange Act of 1934;

- Section 13(b) of the Securities and Exchange Act of 1934;

- Rule 10b-5 of the Securities and Exchange Act of 1934;

- Rule, 12b-20 of the Securities and Exchange Act of 1934;

- Rule, 13a-1 of the Securities and Exchange Act of 1934;

- Rule 13a-11of the Securities and Exchange Act of 1934;

- Rule 13a-13of the Securities and Exchange Act of 1934;

- Rule 13a-14 of the Securities and Exchange Act of 1934;

- Rule 13a-15 of the Securities and Exchange Act of 1934; and

- Rule 13b2-1 of the Securities and Exchange Act of 1934.

The Company stated that it was cooperating with the SEC investigation but was "unable to predict the duration, scope or outcome of the investigation, but an adverse outcome is reasonably possible."

22.    A10 continues to address its accounting issues.  On August 10, 2018, A10 filed a notification that quarterly reports for Q1 and Q2'18 would be submitted late, but that the Company expected to submit the filings "in the third quarter of 2018."  On September 24, 2018, A10 filed its Q1'18 Form 10-Q with the SEC.  As of October 4, 2018, A10 still has not filed its Form 10-Q for Q2'18.

**II.    JURISDICTION AND VENUE**

23.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

24.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

25.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  A10 is headquartered in this Judicial District, and substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

26.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

**III.    PARTIES**

**A.    Plaintiffs**

27.    **Lead Plaintiff Eric Blackwell** (previously defined as "Blackwell") purchased A10 common stock during the Class Period, as was detailed in his sworn certification, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.  *See* ECF No. 57-2.

28.     **Additional Plaintiff Robert Kraszewski** (previously defined as "Kraszewski") purchased A10 common stock during the Class Period, as was detailed in his sworn certification, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.  *See* ECF No. 59-2.

**B.     Defendants**

29.     **Defendant A10 Networks, Inc.** provides software and hardware solutions in the United States and internationally.  A10 is a Secure Application Services™ company, providing a range of high-performance application networking solutions that help organizations ensure that their data center applications and networks remain highly available, accelerated and secure.  The Company is incorporated in Delaware and its principal executive offices are located at 3 West Plumeria Drive, San Jose, California 95134. A10's securities trade on the NYSE under the ticker symbol "ATEN."

30.     **Defendant Lee Chen** is the founder and has been the CEO and a director of A10 at all relevant times.  Prior to founding A10, Chen was the co-founder vice president of engineering at Foundry Networks.

31.     **Defendant Greg Straughn** was A10's CFO from the beginning of the Class Period until February 9, 2017.  Prior to joining A10 in 2011, Straughn had prior experience serving as a CFO, including at Kabira Technologies, Inc., a provider of high-performance software products to the telecommunications and financial services market.  Straughn holds a B.S. in Finance from the University of California at Berkeley.

32.     **Defendant Shiva Natarajan** served as A10's interim CFO from February 2017 until June 2017.  Prior to being appointed Interim CFO, he served as the Company's Vice President and Controller and was responsible for global accounting operations.  Prior to joining A10 Networks in September 2015, Natarajan served as vice president, controller, and chief accounting officer at Fluidigm Corporation.  Subsequent to being employed as Senior Manager of Assurance and Advisory Business Services at Ernst & Young and prior to joining A10, Natarajan held senior corporate finance and accounting roles at other companies.

33.     **Defendant Tom Constantino** has been A10's CFO since June 2017.  Constantino holds a B.S. in Business Administration from San Jose State University and began his career in public accounting at PricewaterhouseCoopers.  Prior to joining A10, Constantino served as Vice President of Accounting and Finance Operations with Western Digital as well as CFO of its HGST subsidiary.

34.     **Defendant Ray Smets** was the EVP of Worldwide Sales from November 2016 until October 2017, and was Vice President of Worldwide Sales from July 2013 to November 2016.

35.     Defendants Chen, Straughn, Natarajan, Constantino, and Smets are sometimes referred to herein as the "Individual Defendants."

36.     Defendant A10 and the Individual Defendants are collectively referred to as "Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the content of A10's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements, pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.     FACTUAL BACKGROUND

### A.     A10's Business

37.     A10 provides software and hardware solutions in the United States and internationally.  A10 is a secure application services solutions and services company, enabling its customers to secure and optimize the performance of their data center and cloud applications and secure their users, applications and infrastructure from internet, web and network threats at scale.

These solutions are designed to give customers the visibility, performance, and security their applications need across both on-premise and cloud environments to produce greater agility for their businesses.   A10's customers include cloud providers, web-scale companies, service providers, government organizations and enterprises.

38.   During the Class Period, A10's product portfolio consisted of six advanced application delivery and security products.   During the Class Period, the Company's product revenues declined from 69.5% in 2015 to approximately 67% in 2016 and down to 64.7% in 2017. A10's products are offered in a variety of form factors, such as optimized hardware appliances, bare metal software, virtual appliances, and cloud-native software.   With the exception of Lightning ADS, A10's products are built on its Advanced Core Operating System ("ACOS") platform and leverage its performance optimization and security features.   ACOS' high-performance design enables A10's products to address a wide range of performance-driven networking challenges.   The flexible software design of ACOS allowed A10 to apply its portfolio to a variety of markets for a variety of needs, such defending against the rising volume of large-scale, sophisticated Distributed Denial of Service ("DDoS") attacks.

39.   A10 also offers a broad range of support services including installation, phone support, repair and replacement, software updates, online tools, consulting and training services. All customers receive standard warranty support for 90 days with purchase of A10 products. Greater than 95% of A10 customers purchase one of its maintenance offerings, which entitles them to the support provided by A10's global support team.   Maintenance contracts may be purchased with products in 12 month increments up to five years.   The average maintenance contract term is approximately 18 months.   A10 invoices its channel partners or customers directly for maintenance contracts at the time of hardware purchase.   All maintenance contracts are non-cancellable and are generally renewed through the same channel as originally purchased.   During the Class Period, service revenues accounted for 30.5%, 33%, 36.3% of its total revenues in 2015, 2016, and 2017, respectively.

40.   A10's geographic concentration was a concern for investors during the Class Period. During the years ending December 31, 2017, 2016 and 2015, the Company derived 49%, 52%, and

54% of its total revenue from the United States and 22%, 23%, 18% of its total revenue from Japan, respectively.  Geographic diversification was particularly important in 2015 when the Yen suffered a drastic decline in value compared to the dollar, impacting the Company's Japanese revenues and making the Company more reliant on North America and other regions.

41.     A10's customer concentration was another concern for investors during the Class Period.  Purchases from its ten largest end-customers accounted for 35%, 36% and 32% of total revenue during the years ended December 31, 2017, 2016 and 2015, respectively.  In 2016, one distribution channel partner accounted for 14% of its total revenue, yet no customer accounted for more than 10% of its total revenue in 2015 or 2017.  As of December 31, 2015, two customers accounted for 27% and 11% of A10's gross accounts receivable, and three customers accounted for 15%, 13% and 11% of gross accounts receivable as of December 31, 2016; however, no customer accounted for over 10% of A10's gross accounts receivable as of December 31, 2017.  Sales to these large end-customers were typically characterized by large but irregular purchases with long sales cycles.  The Company noted that the timing of these purchases and the delivery of the purchased products are difficult to predict.

42.     To lessen the risk associated with its geographic and customer concentration, the Company made efforts to diversify its revenue base through channel partners (resellers and distributors).  The Company fulfills nearly all orders globally through its distribution channel partners, which include distributors, value added resellers and system integrators.  Revenue fulfilled through its distribution channel partners accounted for 86%, 85% and 81% of total revenue for the years ended December 31, 2017, 2016 and 2015, respectively.  The Company launched its Affinity channel program in 2014 in North America, and it was rolled out globally in 2015.

43.     During the May 4, 2015 Q1'15 earnings call, Chen observed, "It has been close to one year since we launched our affinity channel program, and we have seen a nice uptick in the channel-led closed and initiated deals compared with this time last year. Additionally, our channel pipeline has grown over 75%."  During the same call, Smets described how the affinity channel program was one of two factors driving North American growth:

From the North American perspective, *really the underpinning of North America's success was really two key factors. The first one was enterprise growth, without a doubt. Obviously that was helped with the significant Fortune 50 win we had. But also we've been making this investment in building our channel, the affinity channel program for A10 Networks, and that channel was actually working quite well for us.*

As Lee mentioned in his prepared remarks, we saw an uptick in channel closed deals as well as channel pipeline development for us in North America, and we saw that as a positive. So despite some of the challenge we saw – the headwind, *I would say, we saw in deal size on the service provider side, it was enterprise and channel investment that really helped.*

44.     Likewise, a May 19, 2015 J.P. Morgan report discussed the Company's channel strategy, stating:

A10's total channel partner count remained unchanged Y/Y at 650.   However, within this base, the company eliminated ~100 lower performing channel partners while adding 100 new partners.  The company plans to grow its channel presence in EMEA this quarter and following that expects to expand channel presence in APAC.  A10 modified its channel partners incentive plan to reward product sales somewhat more than maintenance services sales.

45.     Smets noted on the Company's Q2'15 earnings call that Affinity was "targeted specifically to the ADC, and very, very much so targeted into the enterprise."   Dougherty & Company LLC's ("Dougherty & Company") July 31, 2015 report indicated that A10's strong enterprise performance in Q2'15 was driven by security sales with "smaller regional [Value Added Resellers] in the banking vertical" and that "[m]anagement indicated the Affinity channel program progress supported an uptick in deal registration as well as an increase in the number of deals coming through the channel."

46.     On October 26, 2015, the Buckingham Research Group issued a report stating that A10 had introduced "a new channel program with an emphasis on security" and noted "a push into federal earlier in the year."

47.     Heading into 2016, the market was experiencing a decline in enterprise IT spending, yet A10's high-end security products and focus on the channel was thought to insulate it from these market issues allowing the Company reported record enterprise sales from Q2'15 to Q1'16.  The Company began telling the market it would reach non-GAAP profitability in 2016.

48.     On February 9, 2016, the beginning of the Class Period, A10 announced its Q4'15 earnings, reporting its third straight quarter of record sales with product revenue at an all-time high driven by sales of the Company's security solution to enterprise and service provider customers. J.P. Morgan issued a report that same day stating, "A10 Networks reported a solid beat and raise in spite of slowing enterprise IT spending.  The company generated record bookings as it saw a broad-based increase in demand across products and verticals."  Buckingham Research Group also issued a report the following day, noting, "The company did have a large service provider customer in the quarter, accounting for ~20% of 4Q sales, driving average deal sizes higher but also increasing customer concentration.  Note that ex-the-large-customer, bookings in 4Q were still a record high, and better 1Q guidance implies improving visibility without a 'gap' following recognition of the large deal – a positive, in our view."

49.     A10 again slightly surpassed revenue and EPS expectations in Q1'16. Oppenheimer's April 28, 2016 report noted, "With a tough macro backdrop and rising competitive pressures, the company is executing well and seeing strong demand for its security solutions (TPS DDoS), continued expansion of its enterprise customer base (now ~60% of revenue), and a recovery in Japan (up 23% YoY)."

50.     On May 17, 2016, Dougherty & Company issued a report summarizing a recent investor meeting with CFO Straughn where he discussed the efforts to diversify and grow demand in the channel:

> Our key takeaways are as follows:  (1) The company's pipeline remains strong. Healthy backlog should flow through to the top-line during the year.  In Q1'16, management noted they maintained a similar backlog figure to their record-high $10.5M recorded in Q4'15.  (2) A10 has significantly diversified their customer base in recent years.  The company now has a wider set of revenue generating clients, thus results are no longer as dependent on spending from a few number of concentrated customers as it has been in the past.  (3) The company is quickly approaching profitability. Management reiterated their expectation to have their first profitable quarter in FY'16, a key milestone for their progress going forward.

> * * *

> Straughn highlighted two key dynamics in the channel: 1) Smaller deals in the range of $30K are growing in size and 2) they are also moving upmarket through larger resellers such as Ingram Micro, Westcon and Dimension Data.  This continues to be

indicative of a general trend of improvement in the channel program that has appeared over the last several quarters. This change dates back to Q3'15, when management noted a shift in terms of opportunities, as that quarter represented an inflection point where A10's channel was presenting more opportunities to the company as opposed to the company providing lead generation to the channel.

51.     The Company's enterprise revenue began to decline in North America in Q2'16, yet revenue from Japan began to recover, growing 83% compared to Q2'15 and the Company issued a better than expected outlook increasing the market's anticipation of the Company reaching non-GAAP profitability. In addition, the Company increased its inventory reserve for older product. During the Q2'16 earnings call, Smets explained:

> So from an enterprise perspective, we actually saw good performance year-over-year and quarter-over-quarter, so we're actually pretty satisfied with that approach. I'd say one of the strongest headlines in the quarter is really strong performance in our run rate business, which is primarily made up by enterprise. So we've invested in a channel program. We call it Affinity channel and it is delivering, I think very, very nicely to our strategy to growth, so we saw some good stability there.

52.     On July 29, 2016, Dougherty & Company issued a report stating, "Management provided for solid guidance on the call, which implies the company could become profitable during the next period if they hit the top-end of their revenue range. In general, Q2 was solid, but not spectacular results, as revenues from JAPAN/APAC compensated for weakness in the EMEA region and the sequential decrease in enterprise revenue." A July 29, 2016 Morgan Stanley report noted:

> A10 had a difficult year post-IPO as customer and geographic concentration created significant volatility in results. While the company still has a 10% customer in many quarters, they have made investments to grow their channel as well as expand their product platform (e.g. security products like TPS, SSLi and CFW) that have increased predictability as well as helped the company maintain growth rates meaningfully higher than the industry. Service providers still make up a majority of revenue, however, geographic and product concentration has been reduced (e.g. Japan is less than 20% of revenue today from ~40% at the IPO).

53.     In Q3'16, the Company missed the mid-point of its guidance range by $3.9 million, reporting that a handful of deals slipped, primarily in North America; however, disciplined expense management drove operating income and the Company achieved break-even non-GAAP EPS. An October 28, 2016 report from Dougherty & Company stated, "Management cited that these were

1    not lost to a competitor, but timing challenges.  On an encouraging note, the company has met a

2    key milestone and posted earlier-than-expected non-GAAP profitability."

3    54.    The Company appeared to bounce back in Q4'16, reporting record product revenue,

4    security revenue, U.S. revenue, bookings, and deferred revenue, and notably a 13% revenue

5    contribution from a single cloud provider believed to be Microsoft Azure ("Microsoft").  A10 also

6    announced on its February 9, 2016 earnings call that CFO Straughn had resigned and would be

7    replaced in the interim by Natarajan, until a successor was found.

8    55.    The Company reported in line 1Q'17 results on April 27, 2017, benefitting from the

9    continued fulfillment of the large cloud order placed in Q4'16 believed to be Microsoft, while the

10   Company's enterprise business was weak as a result of softer sales in North America due to the

11   end-of-sale for their entry-level appliances.  Shortly after the Company released its Q1'17 results,

12   in May 2017 the Company announced it had hired Constantino as its new CFO.

13   56.    Dougherty & Company issued a report on April 28, 2017 stating:

14       Management noted that they had one cloud customer that contributed 12% of
         revenue during Q1. We believe this is continued fulfillment of a large order that
15       was placed by Microsoft Azure at the end of Q4 (Microsoft contributed 13% of
         revenue in that period). We believe the company will continue to pull-through
16       revenue from this order over the next quarter. As a whole, A10 Networks
         generated $33.0M or ~55% of total Q1 revenue from enterprise customers. In-line
17       with our checks, apart from Microsoft the company's enterprise business was
         relatively weak, which management attributed to softer sales in North America
18       due to the end-of-sale for their entry-level appliances.

19

20   57.    A10 pre-announced its Q2'17 results on July 13, 2017, showing revenues 15%

21   below previous guidance.  A Morgan Stanley report issued the same day posited "[h]iccup likely

22   due to CFO transition."   KeyBanc Capital Markets also issued a report that same day, stating,

23   "Demand appears to have weakened primarily in North America and, to a degree, in Japan, where

24   the Company has historically driven a majority of its service provider (SP) business."

25   Oppenheimer's July 14, 2017 report noted, "The dip back below profitability comes after three

26   straight quarters of positive net income (albeit marginal in 3Q16)."

27

28

58.     Later on July 27, 2017, the Company held an earnings call to discuss Q2'17 results and explained that 12 deals got pushed out from Q2 primarily in the U.S. and to a lesser extent in Japan, but it had already closed some of these deals in Q1.  Chen stated:

> We have commenced a thorough review and analysis of our performance this quarter, and we are taking action to improve our execution and support growth for our expanding product portfolio. As Tom will discuss further in a few minutes, some of the initial changes we are making include improving the effectiveness of our go-to-market activities and ***implementing cross-functional measures to drive accountability***.

> In looking at the dynamics within our customer base, ***it is taking longer to get large deals closed***. Within service provider customers, where we believe we have a stronghold, deals can be large but timing of when the order is received can be unpredictable and fluctuate from quarter-to-quarter.

Constantino stated:

> We are increasing our focus to improve our go-to-market efficiency and effectiveness, which includes ***evaluating our sales enablement engine*** to ensure we have dedicated the focus and resources necessary to penetrate deeper into our markets, including security. We are also implementing a number of ***cross-functional actions to increase accountability and improve our performance analytics***. In addition to helping improve our execution, we believe these actions will also help drive greater visibility.

Smets commented:

> So, just commenting on those deals that slipped, we've actually initiated a pretty thorough review analysis to try to really get under this.  If the deals that we're closing there are fairly complex in nature and, like I had mentioned earlier, their complex for a number of different reasons, some things we can control and some things we can't.  So, we've ***identified some initial actions that we want to take some action around to improve execution***. ***<u>One area is around making sure that our sales organization is more trained to sell in this particularly increasingly complex environment</u>***.  And we're also looking at ways to improve cross-functional measures to improve the products and create a more simplified product, so that we can sell.

59.     An analyst on the call asked whether the deals were factored into the next quarter guidance, and Chen and Constantino gave different answers, with Constantino offering a more sober outlook:

> <Q - Mark Kelleher>: So, it's an increased sales cycle.  That's kind of the issue, it's taking longer to close these complicated deals?  And you're factoring that again into the next quarter guidance, is that correct?

<A - Lee Chen>: Yes. Yes.

<A - Tom Constantino>: Yeah. I don't see – I would say – this is Tom. **The timing of when those deals may close is _definitely not determined_**.  And so, we may not see those in the quarter.  But as we set guidance we looked across all other deals, we try to take a very measured approach to what we could expect in terms of conversion rate of our pipeline and we added an extra level of caution when we prepared our guidance taking that into consideration.

60.     A10 followed the disappointing Q2'17 with revenue out-performing *Street* expectations in Q3'17 due to revenue from large service provider customers.  On the Q3'17 earnings call, Constantino attributed the results to the Company's accountability improvements:

> Overall, we delivered a strong third quarter and we are pleased with the initial progress we are seeing from the actions we took to improve execution. More specifically, we improved our forecasting processes and sales performance analytics which led to improved sales execution.
>
> We also improved our focus on accountability and performance management. Similarly, we have taken steps to improve our cross-functional collaboration in support of sales in delivering the quarter. While we have more work to do, as mentioned by Lee, we believe we are on the right track and that our efforts helped us deliver a strong finish to the quarter.

61.     On December 20, 2017, Dougherty & Company issued a report following investor meetings with Constantino and Directors of Product Management Tom Guerrette, Kishore Inampudi, and Yasir Liaqatullah.  The report stated, "Management indicated they have more work to do, but in the short term they are seeing improvement in sales velocity through the implementation of sales enablement tools, project management, and cross-functional organization cooperation/communication."

62.     On January 16, 2018, the Company pre-announced negative Q4'17 results with revenue roughly $9.5 million below Street estimates, causing the stock to fall 22% after market close.  Dougherty & Company's report issued the following day noted, "Management attributed the revenue miss to weak seasonal demand trends in North America.  Typically, Q4 is a strong quarter for A10, but our recent North American enterprise checks suggest a roll-up of regional partners may have impacted A10 sales in the period."

63.     On this news, shares of A10 fell $0.99 per share, or over 13%, from its previous closing price to close at $6.32 per share on January 17, 2018, damaging investors.

64.      Weeks later, on January 30, 2018, the Company announced it was conducting an internal investigation into revenue recognition issues from the fourth quarter of 2015 through the fourth quarter of 2017 inclusive and would be postponing the release of its Q4'17 and FY'17 financial results.  On this news, shares of A10 fell $0.86 per share, or over 12%, from its previous closing price to close at $6.13 per share on January 31, 2018, damaging investors.

65.      On August 10, 2018, A10 filed a notification that its quarterly reports for the Q1 and Q2'18 would submitted late, and it expected to submit the filings "in the third quarter of 2018."  As described herein, A10 did not release its Restatement until August 29, 2018, nearly seven months after it announced the internal investigation.  The Company did not file its Q1'18 Form 10-Q until September 24, 2018 and, as of October 4, 2018, A10 still has not filed its Form 10-Q for Q2'18.  Additionally, the Q1'18 Form 10-Q indicated that the Company is still cooperating with the SEC investigation into any securities laws violations by A10 or persons currently or formerly affiliated with A10.

**B.      A10's Financial Results were Materially Misleading and Violated Applicable GAAP, SEC Rules, and Its Own Stated Policies**

66.      As alleged herein, A10's financial statements filed with the SEC, including the Company's Annual Report on Forms 10-K for FY'15 and FY'16, as well as the Company's Quarterly Report on Forms 10-Q for Q1'16 through Q3'17, were materially false and/or misleading when made because these financial statements violated GAAP, applicable SEC rules, and the Company's stated accounting policies.

**1.      Obligations Imposed by the Securities Laws and GAAP**

67.      The Financial Accounting Standards Board ("FASB") is the designated private sector organization for establishing standards of financial accounting that govern the preparation of financial statements.  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants.  In addition to rules and interpretive releases, the SEC issues Staff Accounting Bulletins that represent practices followed by the staff in

administering SEC disclosure requirements, and Staff Announcements and Observer comments at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants.  ASC 105-10-05-1.

68.     As set forth in FASB Statement of Concepts ("Concepts Statement") No. 8, one of the fundamental objectives of financial reporting is that it provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity.[5]  Concepts Statement No. 8, states:

> Information about a reporting entity's financial performance helps users to understand the return that the entity has produced on its economic resources. Information about the return the entity has produced provides an indication of how well management has discharged its responsibilities to make efficient and effective use of the reporting entity's resources. Information about the variability and components of that return also is important, especially in assessing the uncertainty of future cash flows. Information about a reporting entity's past financial performance and how its management discharged its responsibilities usually is helpful in predicting the entity's future returns on its economic resources.

69.     Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210.10-01(a).

### 2.     The Company Systematically Violated its Own Revenue Recognition Policy as well as GAAP Revenue Recognition Principles

70.     Throughout the Class Period, the Company's revenue recognition policy remained consistent.  A10's 2015 and 2016 Forms 10-K, in relevant part, state:

> We derive revenue from two sources: (i) products revenue, which includes hardware and perpetual software license revenue; and (ii) services revenue, which include post contract support ("PCS"), professional services, and training.  A substantial portion of our revenue is from sales of our products and services through distribution channel partners, such as resellers and distributors.  Revenue is recognized, net of applicable taxes, when all of the following criteria are met:

---

[5] FASB Statements of Financial Accounting Concepts broadly cover financial reporting concepts. FASB publishes these documents to provide a general overview of accounting concepts, definitions, and ideas guiding recognition and measurement for financial reporting purposes.

persuasive evidence of an arrangement exists, delivery or performance has occurred, the sales price is fixed or determinable, and collection is reasonably assured.

We define each of the four criteria above as follows:

> **Persuasive evidence of an arrangement exists.**  Evidence of an arrangement consists of a purchase order issued pursuant to the terms and conditions of a master sales agreement.

> **Delivery or performance has occurred.**  We use shipping documents or written evidence of customer acceptance, when applicable, to verify delivery or performance.  We recognize product revenue upon transfer of title and risk of loss, which primarily is upon shipment to customers.  We do not have significant obligations for future performance, such as customer acceptance provisions, rights of return, or pricing credits, associated with our sales.

> **The sales price is fixed or determinable.**  We assess whether the sales price is fixed or determinable based on payment terms and whether the sales price is subject to refund or adjustment.  Standard payment terms to customers range from 30 to 90 days.

> **Collection is reasonably assured.**  We assess probability of collection on a customer-by-customer basis.  Our customers are subjected to a credit review process that evaluates their financial condition and ability to pay for products and services.

PCS revenue includes arrangements for software support and technical support for our products.  PCS is offered under renewable, fee-based contracts, which include technical support, hardware repair and replacement parts, bug fixes, patches, and unspecified upgrades on a when-and-if available basis.  Revenue for PCS services is recognized on a straight-line basis over the service contract term, which is typically one year, but can be up to five years.  Unearned PCS revenue is included in deferred revenue.

Professional service revenue primarily consists of the fees we earn related to installation and consulting services.  We recognize revenue from professional services upon delivery or completion of performance.  Professional service arrangements are typically short term in nature and are largely completed within 30 to 90 days from the start of service.

71.     In these filings, the Company conveyed that it recognized revenue in accordance with Staff Accounting Bulletin No. 101 ("SAB 101"), as amended by Staff Accounting Bulletin No. 104 ("SAB 104") (codified in ASC 605-10-S99).  SAB 104, Topic 13, Revenue Recognition, as amended, and SAB 101, Revenue Recognition in Financial Statements, clearly state that revenue is realized or realizable and earned only if and when all of the following criteria are met:

(a) "Persuasive evidence of an arrangement exists," with the term "arrangement" meaning the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction;

(b) "Delivery has occurred or services have been rendered;"

(c) "The seller's price to the buyer is fixed or determinable;" and

(d) "Collectibility is reasonably assured."

SAB 101(A)(1).

72.    Additionally, FASB Concepts Statement No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, articulates that revenues and gains should not be recognized in financial statements until they are realizable:

(a) "*Realized or realizable.* Revenues and gains generally are not recognized until realized or realizable. Revenues and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash. Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash [FASB Statement of Concepts No. 5, 83a]."

73.    Contrary to the Company's revenue recognition policy, as the Company acknowledged in the Restatement 10-K:

(i)    During the year ended December 31, 2015, revenue on certain sale transactions was recognized prematurely, as it was determined that there was an oversight of facts that indicated collectability was not reasonably assured, because the reseller's or distributor's payment to the Company was contingent on resale of the product or the transaction included extended payment terms beyond the Company's customary terms.

(ii)   During the year ended December 31, 2016, revenue was recognized prematurely at the time, as it was determined that there was an oversight or misuse of facts which indicated that the reseller's or distributor's price was not fixed or determinable, or that collectability was not reasonably assured, because the reseller's or distributor's payment to the Company was contingent on resale of the product or the transaction included extended payment terms beyond the Company's customary terms.

74.    Defendants' premature recognition of revenue for these sales was improper and Defendants failed to make required disclosures of those transactions in A10's SEC filings. Defendants knowingly recognized revenue improperly for sales to resellers or distributors where payment was contingent on resale or the transaction included extended payment terms, and thus the price was not fixed or determinable and/or collectibility was not reasonably assured.

75.     Defendants failed to apply basic accounting principles – improperly recognizing millions of dollars of revenue on its channel sales in violation of GAAP, SEC guidance, and its stated revenue recognition policy.  As a result of these fraudulent accounting practices, Defendants publicly disseminated numerous financial statements that reported artificially inflated revenue and earnings figures.  The Restatement would ultimately reveal that A10's annual financial statements for FY'15 and FY'16, and all of its quarterly financial statements filed on Form 10-Q for the quarters Q1'16 through Q3'17, were materially misstated.

76.     During the Class Period, A10's financial statements and its comments about the Company's financial results were false and misleading, as this financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting and disclosures about its revenues, in violation of GAAP rules.

77.     The fact that A10 restated its annual financial statements on Forms 10-K for FY'15 and FY'16, and its condensed consolidated financial statements contained in its Quarterly Report on Forms 10-Q for each quarter from the quarters ended March 31, 2016 through September 30, 2017, and informed investors that these financial statements should not be relied upon, is an admission that they were false and misleading when originally issued.  APB No. 20, 7-13; SFAS No. 154, 25.

78.     Additionally, A10's financial statements were false and misleading when originally issued since they violated the Company's stated revenue recognition policy and GAAP, including SABs 101 and 104, and FASB Concepts Statement No. 5.

**C.     The Company's Violation of Disclosure Obligations Imposed by GAAP and SEC Regulations**

79.     A10's improper recognition of revenue when payment was contingent on resale and/or when transactions included extended payment terms beyond the Company's customary terms was consistent with a practice of improper "channel stuffing."  Channel stuffing has been defined by the American Institute of Certified Public Accountants ("AICPA") as:

> [A] marketing practice that suppliers sometimes use to boost sales by inducing distributors to buy substantially more inventory than they can promptly resell.

Inducements to overbuy may range from deep discounts on the inventory to threats of losing the distributorship if the inventory is not purchased.[6]

80.     The SEC describes channel stuffing as:

[T]he pulling forward of revenue from future fiscal periods by inducing customers – through price discounts, extended payment terms or other concessions – to submit purchase orders in advance of when they would otherwise do so.[7]

81.     The Company admitted in the Restatement 10-K that revenue was recognized prematurely at the time, as it was determined that the Company had an oversight or misuse of facts which indicated that the reseller's or distributor's price was not fixed or determinable, or collectibility was not reasonably assured because the reseller's or distributor's payment to the Company was contingent on resale of the product or the transaction included extended payment terms beyond the Company's customary terms.

82.     Material channel stuffing of products at the end of a quarter distorts a company's results of operations, and when undisclosed, causes a company's financial reporting to be misleading.  Defendants failed to disclose that reseller's or distributor's payment was contingent on resale and/or that transactions included extended payment terms beyond the Company's customary terms, consistent with a practice of channel stuffing, as required to prevent investors from being misled.   In addition, A10's accounting treatment for its sale transactions was improper, as described above.

83.     Thus, in SAB 104, the SEC referred to the requirements under Financial Reporting Release ("FRR") No. 36,[8] which noted that the following practices – which is analogous to channel stuffing as applied by A10 – *must* be disclosed in the Management Discussion and Analysis ("MD&A") section in Forms 10-K and 10-Q:

---

[6] 1999 AICPA Indicators of Improper Revenue Recognition, at 4.

[7] *In the Matter of Sunbeam Corp.*, Securities Act Release No. 7976, Exchange Act Release No. 44305, Accounting and Auditing Enforcement Act Release No. 1393, File No. 3-10481, 2001 SEC LEXIS 931, at *4 n.4 (May 15, 2001).

[8] SAB 104, referring to FRR No. 36 (§ 501), *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*.

- Shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period.
- ***Granting of extended payment terms*** that will result in a longer collection period for accounts receivable (regardless of whether revenue has been recognized) and slower cash inflows from operations, and the effect on liquidity and capital resources. (The fair value of trade receivables should be disclosed in the footnotes to the financial statements when the fair value does not approximate the carrying amount.)
- ***Changing trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns***.

84.     Defendants also failed to prepare A10's financial statements in accordance with the following fundamental accounting principles:

(a) The principle that financial reporting should "provide financial information about the reporting entity that is useful to existing and potential investors, lenders and other creditors in making decisions about providing resources to the entity. Those decisions involve buying, selling, or holding equity and debt instruments and providing or settling loans and other forms of credit."

(b) The principle that "financial reports provide information about the financial position of a reporting entity, which is information about the entity's economic resources and the claims against the reporting entity . . . the effects of transactions and other events that change a reporting entity's economic resources and claims."

(c) The principle that "[i]nformation about a reporting entity's past financial performance and how its management discharged its responsibilities usually is helpful in predicting the entity's future returns on its economic resources."

(d) The principle that "[i]nformation about a reporting entity's financial performance helps users to understand the return that the entity has produced on its economic resources. Information about the return the entity has produced provides an indication of how well management has discharged its responsibilities to make efficient and effective use of the reporting entity's resources."

(e) The principle that financial reporting should be useful.  "If financial information is to be useful, it must be relevant and faithfully represent what it purports to represent. The usefulness of financial information is enhanced if it is comparable, verifiable, timely, and understandable."

(f) The principle of relevance, which means that it is "capable of making a difference in the decisions made by users. Information may be capable of making a difference in a decision even if some users choose not to take advantage of it or already are aware of it from other sources."

(g) The principle of faithfulness, which means "complete, neutral, and free from error….A complete depiction includes all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations. …A neutral depiction is without bias in the selection or presentation of financial information. …Free from error means there are no errors or omissions in the description of the phenomenon, and the process used to produce the reported information has been selected and applied with no errors in the process."  FASB Concepts Statement No. 8.

85.     Defendants' misstatements of revenue, non-GAAP net operating income(loss), non-GAAP net loss, and non-gap EPS caused by A10's improper sales practices and unreliable accounting in the Company's Annual Report on Forms 10-K for FY'15 and FY'16, as well as the Quarterly Report on Forms 10-Q for Q1'16 through Q3'17, were material.  The SEC clarified the principles of materiality in SAB 99, reaffirming long-accepted concepts expressed in auditing and accounting literature.  It also provides interpretive guidance to ensure those concepts are properly applied.

86.     Among the most important of SAB 99's principles are that:

(a) Registrants and auditors may not rely solely on quantitative criteria to evaluate an item's materiality;
(b) The materiality of items can be determined reliably only if they are evaluated both individually and collectively; and
(c) An intentional misstatement may be illegal even if the item it concerns is immaterial.

87.     According to SAB 99, "quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations.  Materiality concerns the significance of an item to users of a registrant's financial statements.  A matter is 'material' if there is substantial likelihood that a reasonable person would consider it important."

88.     In addition, SAB 99 states that there are several ways in which a "quantitatively small" misstatement may be material:

- Whether the misstatement masks a change in earnings or other corporate trends.

- Whether the misstatement hides a failure to meet analysts' consensus expectations for the business.

- Whether the misstatement changes a loss into income or vice versa.

89.      To the extent that registrants intentionally misstate immaterial items, they potentially violate provisions of the Exchange Act, which mandates the use of accurate and reasonably detailed records as the basis for financial statements.  The improper recognition of revenue when payment was contingent on resale and/or when transactions included extended payment terms beyond the Company's customary terms, consistent with a practice of channel

stuffing was material because A10 and the Individual Defendants knew it was improper.  Not only did it mask a trend of continued non-GAAP losses contrary to having achieved profitability, the magnitude of those transactions was critical to A10's ability to meet its own guidance, it changed losses into income, and "there is substantial likelihood that a reasonable person would consider [the improper transactions to be] important."

90.     Moreover, by failing to disclose the improper recognition of revenue and the impact it would have on the Company's future sales and growth, the Company's Quarterly Report on Forms 10-Q and Annual Report on Forms 10-K, filed with the SEC during the Class Period, failed to comply with the disclosure obligations imposed on Defendants under Item 303 of Regulation S-K.  Item 303 requires the disclosure of known trends that will affect future revenue, specifically: "known trends . . . that have had or that the registrant reasonably expects will have a material . . . favorable impact on . . . revenues."  17 C.F.R. § 229.303(a)(3)(ii).

91.     GAAP regulation ASC 275-1 similarly requires that a company disclose risks and uncertainties that could significantly affect the amounts reported in financial statements in the near term and particularly calls for disclosure if the volumes of business transacted with particular customers could be severely impacted in the near term.

92.     Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information."  *See Management's Discussion and Analysis of Fin. Condition and Results of Operation*, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).  Indeed, the SEC has stated that disclosure requirements under Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future."  *Id*. at *3, *17.  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *See Commission Guidance Regarding Management's Discussion and Analysis of Fin.*

*Condition and Results of Operations*, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (Dec. 19, 2003).

93.     Disclosure of known trends and forward-looking information concerning the registrant's revenue are required by Item 303 "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operations."  *See Management's Discussion*, S.E.C. Release No. 6835, 1989 WL 1092885, at *4.

### 1.     Defendants Knowingly and/or Recklessly Improperly Recognized Revenues to Meet Market Expectations in Q4'15

94.     Defendants engaged in accounting fraud for the purpose of managing A10's quarterly revenue and earnings to satisfy the market's expectations.  In Q4'15 the market was concerned with the impact a slowdown in enterprise IT customer spending would have on A10.[9] A10 seemingly had bucked the trend reporting record bookings in the enterprise segment and product revenue at an all-time high resulting in the Company's third straight quarter of record sales. Straughn explained that these results were achieved in large part due to "a large win with an existing service provider customer in the quarter that when combined with other orders and ongoing purchases from this customer, accounted for 19.7% of total revenue in the fourth quarter." J.P. Morgan issued a report on February 9, 2016 noting, "A10 reported Q4 revenues of $57M, beating our estimate by 3% and consensus by 4%."

95.     The Restatement 10-K revised the Company's Q4'15 revenue downward by a material amount of approximately $2.67 million, which would have caused the Company to miss consensus expectations.  In addition, products revenue was restated downward by a material amount of approximately $3.4 million.  The Restatement 10-K expressly stated that revenue was "recognized prematurely" as "collectability was not reasonably assured" due to the fact that "the reseller's or distributor's payment to the Company was contingent on resale of the product or the transaction included extended payment terms beyond the Company's customary terms."

---

[9] *See, e.g.*, February 9, 2016 J.P. Morgan report "Q4'15 Preview: Cautious on guide due to concerns over enterprise IT spending slowdown."

| GAAP | Year Ended December 31, 2015 |
|------|------------------------------|
| Products Revenue – Restated | 134,931 |
| Products Revenue – As Previously Reported | 138,301 |
| Products Revenue - Error | **(3,370)** |
|  |  |
| Total Revenue – Restated | 196,285 |
| Total Revenue – As Previously Reported | 198,955 |
| Total Revenue Error | **(2,670)** |

96.     By recognizing revenue when payment was contingent on resale or when the transaction included extended payment terms, A10 expressly violated SABs 101 and 104, and the SEC Codification of Staff Accounting Bulletin, Topic 13 criterion as discussed above in Section IV.B.2 ¶71, and admitted by the Company in the Restatement 10-K.

97.     Additionally, the Company violated FASB Concepts Statement No. 5's principle that "revenues and gains generally are not recognized until realized or realizable" because reseller's or distributor's payment was contingent on resale or the transactions included extended payment terms beyond the Company's customary terms, the revenues were not actually realized in this quarter.

98.     Defendants intentionally ignored these basic and long-standing accounting rules and principles and, in doing so, improperly recognized revenue in Q4'15.

99.     The Company's revenue recognition policy specifically required Defendants to "assess probability of collection on a customer-by-customer basis" to determine if recognition of revenue was appropriate.  If the Individual Defendants conducted this assessment, they would have known that payment was contingent on resale and/or that extended payment terms had been granted; and therefore, the Individual Defendants knew or were deliberately reckless in not knowing that recognizing revenue was improper.

**2.     Defendants Knowingly and/or Recklessly Improperly Recognized Revenues to Meet Market Expectations in Q3'16**

100.    On October 27, 2016, the Company held an earnings call to discuss its Q3'16 financial results.  Chen stated, "We reported revenue of $55.1 million, up 8% year-over-year and below our guidance of $58 million to $60 million.  Our continued focus on driving leverages through our operating structure led to a significant improvement in EPS.  For the quarter, we reached non-GAAP breakeven, which was at the high end of our guidance."  Chen attributed the

revenue shortfall to "receiv[ing] a couple orders too late in the quarter to ship and some deals slipped into future quarters," assuring investors "we expect these transactions to be closed in either Q4 or Q1."

101.    The Company's announcement that it had reached its goal of non-GAAP profitability and non-GAAP breakeven EPS were critical indicators of financial success to investors, reversing a trend of operating losses that helped to offset the negative news that A10 had missed its revenue guidance.[10]   On October 28, 2016, following A10's release of its Q3'16 results, Dougherty & Company reported, "The Company hit a key milestone and was able to achieve non-GAAP profitability and above the high-end of their guided range of ($0.02)-($0.00)."

| NON-GAAP Financial Measures ($M, except EPS) | Q1'16 | Q2'16 | Q3'16 |
|---|---|---|---|
| Operating Income (Loss) | $(4.0) | $(1.9) | $0.3 |
| Net income (loss) per share | $(0.06) | ($0.02) | $0.00 |

102.    The Restatement 10-K expressly stated that revenue during the year ended December 31, 2016 was "recognized prematurely" as there was an "oversight or misuse of facts which indicated that the reseller's or distributor's price was not fixed or determinable, or that collectability was not reasonably assured, because the reseller's or distributor's payment to the Company was contingent on resale of the product or the transaction included extended payment terms beyond the Company's customary terms."

103.    The restated non-GAAP income showed a Q3'16 loss of $0.2 million rather than net income of $0.3 million, and non-GAAP EPS was a loss of $0.01 rather than breakeven $0.00.  The Restatement indicated that in Q3'16, the Company's non-GAAP operating income and net income per share had been artificially inflated by improperly recognizing revenue and other accounting errors, and in fact, the Company's financial condition in Q3'16 was materially different than previously stated as it continued to operate at a non-GAAP loss and had not reached non-GAAP profitability.

---

[10] In Q3'16, non-GAAP net income was $0.2 million, while non-GAAP EPS broke even at $0.00.

| ($M, except EPS) | Q3'16 GAAP – Previously Reported | Q3'16 GAAP – Restate | Q3'16 NON-GAAP – Previously Reported | Q3'16 NON-GAAP - Restated |
|---|---|---|---|---|
| Income (loss) from operations | $(4.6) | $(5.1) | $0.3 | $(0.2) |
| Net loss | $(4.7) | $(5.2) | $0.2 | $(.4) |
| Net loss per share - Basic and diluted | $(0.07) | $(0.08) | $0.0 | ($0.01) |

104.     As explained above in Section IV.B.2 ¶72, Defendants additionally violated an overarching accounting principle in Q3'16 that revenues and gains should not be recognized in the financial statements until they are realized or realizable.  Because the reseller's or distributor's payment was contingent on resale or the transactions included extended payment terms beyond the Company's customary terms, the revenues were not actually realized in this quarter.  FASB Concepts Statement No. 5.

105.     Additionally, as explained in Section IV.B.2 ¶71, SABs 101 and 104 and the SEC Codification of Staff Accounting Bulletin, Topic 13 require that "collectibility is reasonably assured" and "the seller's price to the buyer is fixed or determinable" in order to recognize revenue. However, as A10 subsequently admitted, "During the year ended December 31, 2016, revenue was recognized prematurely at the time" because "collectibility was not reasonably assured" and the "reseller's or distributor's price was not fixed or determinable" due to the fact that "reseller's or distributor's payment to the Company was contingent on resale of the product or the transaction included extended payment terms beyond the Company's customary terms."

106.     Defendants intentionally ignored these basic and long-standing accounting rules and principles and the Company's revenue recognition policy, and, in doing so, improperly recognized revenue in Q3'16.

107.     The Company's revenue recognition policy also specifically required the Individual Defendants to "assess whether the sales price is fixed or determinable based on payment terms and whether the sales price is subject to refund or adjustment" and to "assess probability of collection on a customer-by-customer basis" to determine if recognition of revenue was appropriate.  If the Individual Defendants conducted these assessments, they would have known that payment was contingent on resale and/or that extended payment terms had been granted; and therefore, the

Individual Defendants knew or were deliberately reckless in not knowing that recognizing revenue was improper.

### 3. Defendants Knowingly and/or Recklessly Improperly Recognized Revenues to Meet Market Expectations in Q4'16

108.    On February 9, 2017, the Company held an earnings call to discuss its FY'16 and Q4'16 financial results.  Chen stated, "Revenue grew 13% year-over-year to reach a record $64 million, and exceeded the high-end of our guidance.  Our continued focus on driving leverage through our operating structure led to a significant improvement in our operating results and margin.  On the bottom line, we delivered $0.03 in non-GAAP EPS, which was within our guidance range."  The Company's Q4'16 non-GAAP EPS guidance range was between break-even and $0.04, indicating the initially reported non-GAAP EPS was in fact at the high-end of its guidance.  A10 reported non-GAAP net income of $2.3 million and "record product revenue of $43.5 million, up 23% over Q3 and 10% over the last year."  Following the release of A10's Q4'16 results, J.P. Morgan issued a report stating, "A10 reported Q4 revenues of $64m, beating consensus by 5%."

109.    The Restatement 10-K expressly stated that revenue during the year ended December 31, 2016 was "recognized prematurely" as there was an "oversight or misuse of facts which indicated that the reseller's or distributor's price was not fixed or determinable, or that collectability was not reasonably assured, because the reseller's or distributor's payment to the Company was contingent on resale of the product or the transaction included extended payment terms beyond the Company's customary terms."

110.    The Restatement indicated that its Q4'16 results were materially different than initially presented, showing the Company's Q4'16 revenues were approximately $60.7 million, falling short of the $61 million consensus rather than exceeding it by 5%.  Product revenues in Q4'16 were also inflated by $3 million, more than 5%, due to the undisclosed improper revenue recognition.  The Restatement also changed Q4'16 positive non-GAAP net income of $2.3 million to a loss of approximately $0.3 million, and non-GAAP EPS went from $0.03, which was above the midpoint of the Company's guidance to $0.00, which was at the bottom of the guidance range.

The Restatement wiped out the Company's previously reported trend of increasing non-GAAP profitability and revealed that the Company's record of consistent financial performance was an illusion.

| ($M, except EPS) | Q4'16 GAAP – Previously Reported | Q4'16 GAAP – Restated | Q4'16 NON-GAAP – Previously Reported | Q4'16 NON-GAAP - Restated |
|---|---|---|---|---|
| Revenue – Product | $43.5 | $40.5 | | |
| Total Revenue | $64.0 | $60.8 | $64.0 | $60.8 |
| Income (loss) from operations | $0.6 | $(2.0) | $4.7 | $2.2 |
| Net loss | $(1.8) | $(4.4) | $2.3 | $(0.3) |
| Net income (loss) per share - Basic and diluted | $(0.03) | $(0.06) | $0.03 | $(0.00) |

111.    As explained above in Section IV.B.2 ¶72, in Q4'16, Defendants additionally violated an overarching accounting principle that revenues and gains should not be recognized in the financial statements until they are realized or realizable.  Because the reseller's or distributor's payment was contingent on resale or the transactions included extended payment terms beyond the Company's customary terms, the revenues were not actually realized in this quarter.  FASB Concepts Statement No. 5.  Additionally, as explained in ¶71, SABs 101 and 104 and the SEC Codification of Staff Accounting Bulletin, Topic 13 require that "collectibility is reasonably assured" and "the seller's price to the buyer is fixed or determinable" in order to recognize revenue. However, as A10 subsequently admitted, "During the year ended December 31, 2016, revenue was recognized prematurely at the time" because "collectibility was not reasonably assured" and the "reseller's or distributor's price was not fixed or determinable" due to the fact that "reseller's or distributor's payment to the Company was contingent on resale of the product or the transaction included extended payment terms beyond the Company's customary terms."

112.    Defendants intentionally ignored these basic and long-standing accounting rules and principles and the Company's revenue recognition policy, and, in doing so, improperly recognized revenue from the Q4 2016 transactions during the Class Period.

113.    The Company's revenue recognition policy also specifically required the Individual Defendants to "assess whether the sales price is fixed or determinable based on payment terms and whether the sales price is subject to refund or adjustment" and to "assess probability of collection

on a customer-by-customer basis" to determine if recognition of revenue was appropriate.  If the Individual Defendants conducted these assessments, they would have known that payment was contingent on resale and/or that extended payment terms had been granted; and therefore, the Individual Defendants knew or were deliberately reckless in not knowing that recognizing revenue was improper.

## V.   DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A.   False and Misleading Statements in the February 9, 2016 Fourth Quarter and Year-End 2015 Earnings Press Release and Conference Call

114.   On February 9, 2016, the first day of the Class Period, A10 issued a press release announcing its fourth quarter and year-end 2015 financial results (the "February 2016 Press Release"), stating in relevant part:

**Fourth Quarter 2015 Financial Highlights**

• *Record revenue of $56.6 million, up 25 percent year-over-year*

• *Record product revenue of $39.5 million, increasing 22 percent year-over-year*

• Added over 200 new end-customers in the quarter, reaching over 4,700 total end-customers

"The fourth quarter was a strong close to the year and we are pleased with our momentum driven by our continued execution and innovation," said Lee Chen, president and chief executive officer of A10 Networks.  "***Revenue in the fourth quarter exceeded our guidance and we achieved our third consecutive quarter of record revenue***, while significantly improving our bottom line year-over-year.  Our results this quarter were driven by a broad-based increase in demand across our ADC, CGN and TPS solutions.  For the full year we added over 800 new customers, continued to expand our market opportunities and widened our technology leadership with innovations and industry firsts that map directly to some of the fastest growing networking and security market trends."

***Total revenue for the fourth quarter grew to a record $56.6 million, up 25 percent when compared with $45.2 million in the fourth quarter of 2014.  Total revenue for the year 2015 was $199.0 million, an increase of 11 percent, compared with $179.5 million reported for the year 2014.***

***On a GAAP basis, A10 Networks reported a net loss for the fourth quarter 2015 of $7.4 million or $0.12 per share***, compared with a net loss of $16.0 million or $0.26 per share in the fourth quarter of 2014.  The company reported GAAP net loss attributable to common shareholders of $40.0 million or $0.64 per share for

the year 2015, compared with a GAAP net loss attributable to common stockholders of $35.9 million or $0.74 per share for the year 2014.

***Non-GAAP net loss for the fourth quarter of 2015 was $3.7 million or $0.06 per share***, compared with a non-GAAP net loss of $12.0 million or $0.20 per share in the fourth quarter of 2014.  Non-GAAP net loss for 2015 was $22.5 million or $0.36 per share, compared with a Non-GAAP net loss of $29.3 million or $0.51 per share for the year 2014.  A reconciliation between GAAP and non-GAAP information is contained in the financial statements below.

115.    On the same day, the Company held an investor conference call to discuss A10's fourth quarter and year-end 2015 financial results.  Defendants Chen and Straughn repeated the same false and misleading revenue and net loss numbers for Q4'15 and FY'15 as reported in the February 2016 Press Release.  Defendant Chen stated that the Company had "generated record bookings," attributing revenue growth to "our continued execution and innovation."

116.    Defendant Straughn also stated:

We expect gross margin to remain in the range of 75% to 77% and operating expenses to be between $45 million and $47 million.  For modeling purposes, please note that we are currently planning modest sequential increases in OpEx throughout 2016, and we ***remain committed to achieving our stated goal of reaching non-GAAP operating income profitability during 2016.***

117.    Analysts and investors reacted favorably to this news.  A10's stock price rose from a closing price of $4.92 per share on February 9, 2016 to close at $5.66 per share on February 10, 2016 on heavy trading volume of over 1.6 million.  Dougherty & Company reiterated its Buy rating, stating: "Overall, we believe A10's Q4 result represents more evidence of improved execution by the company."

118.    The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, financial results and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) overstated revenue for the Q4'15 and FY'15 by prematurely recognizing revenue; (ii) understated net loss for the Q4'15 and FY'15; (iii) violated A10's stated revenue recognition policies; (iv) as, a result of (i) – (iii) the Company's

business and prospects were worse than represented; and, (v) Defendants' public statements were materially false and misleading at all relevant times.

**B.      False and Misleading Statements in the 2015 Annual Report**

119.     On March 1, 2016, A10 filed its Annual Report on Form 10-K with the SEC for the year-ended December 31, 2015 (the "2015 Annual Report") which was signed and certified by Defendants Chen and Straughn.

120.     The 2015 Annual Report falsely represented that A10 recognized revenue as follows:

**Revenue Recognition**

We derive revenue from two sources: (i) products revenue, which includes hardware and perpetual software license revenue; and (ii) services revenue, which include post contract support ("PCS"), professional services, and training.   A substantial portion of our revenue is from sales of our products and services through distribution channel partners, such as resellers and distributors.   Revenue is recognized, net of applicable taxes, when all of the following criteria are met: persuasive evidence of an arrangement exists, delivery or performance has occurred, the sales price is fixed or determinable, and collection is reasonably assured.

We define each of the four criteria above as follows:

- ***Persuasive evidence of an arrangement exists.***   Evidence of an arrangement consists of a purchase order issued pursuant to the terms and conditions of a master sales agreement.

- ***Delivery or performance has occurred.***   We use shipping documents or written evidence of customer acceptance, when applicable, to verify delivery or performance.   We recognize product revenue upon transfer of title and risk of loss, which primarily is upon shipment to customers.   We do not have significant obligations for future performance, such as customer acceptance provisions, rights of return, or pricing credits, associated with our sales.

- ***The sales price is fixed or determinable.***   We assess whether the sales price is fixed or determinable based on payment terms and whether the sales price is subject to refund or adjustment.   Standard payment terms to customers range from 30 to 90 days.

- ***Collection is reasonably assured.***   We assess probability of collection on a customer-by-customer basis.   Our customers are subjected to a credit review process that evaluates their financial condition and ability to pay for products and services.

PCS revenue includes arrangements for software support and technical support for our products. PCS is offered under renewable, fee-based contracts, which include technical support, hardware repair and replacement parts, bug fixes, patches, and unspecified upgrades on a when-and-if available basis. Revenue for PCS services is recognized on a straight-line basis over the service contract term, which is typically one year, but can be up to five years. Unearned PCS revenue is included in deferred revenue.

Professional service revenue primarily consists of the fees we earn related to installation and consulting services. We recognize revenue from professional services upon delivery or completion of performance. Professional service arrangements are typically short term in nature and are largely completed within 30 to 90 days from the start of service.

121.    The 2015 Annual Report also included the following additional statements pertaining to A10's revenue recognition policies:

As a result of end-customer buying patterns and the efforts of our sales force and distribution channel partners to meet or exceed their sales objectives, we have historically received a substantial portion of purchase orders and generated a substantial portion of revenue during the last few weeks of each quarter. *We can recognize such revenue in the quarter received, however, only if all of the requirements of revenue recognition, especially shipment, are met by the end of the quarter.*

* * *

Our products revenue primarily consists of revenue from sales of our hardware appliances upon which our software is installed. Such software includes our ACOS software platform plus one of our ADC, CGN, TPS or CFW solutions (which we expect to start shipping in the first quarter of 2016). Purchase of a hardware appliance includes a perpetual license to the included software. *We recognize products revenue at the time of shipment, provided that all other revenue recognition criteria have been met.*

122.    The 2015 Annual Report reported total revenue for the fourth quarter and year-end 2015 as $56.6 million and $199 million, respectively, and a net loss of $7.4 million and $40 million, respectively.

123.    According to the 2015 Annual Report, the increase in total revenues was attributable to the following:

During 2015, $106.8 million, or 54% of total revenue was generated from the United States, which represents a 25% increase compared to 2014.  This increase was primarily attributable to increased product revenue from service provider customers as well as higher PCS sales in connection with our increased installed customer base.

124.    The 2015 Annual Report also falsely represented that "[t]he accompanying consolidated financial statements have been prepared in accordance with [GAAP]" and that A10 maintained adequate internal controls over the Company's financial reporting, stating in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as required by Rule 13a-15(b) under the Securities Exchange Act of 1934 as of December 31, 2015.

\* \* \*

Based upon our management's evaluation of our disclosure controls and procedures as of December 31, 2015, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, *our disclosure controls and procedures are designed at a reasonable assurance level and are effective* to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Management's Report On Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act).  Our management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria set forth in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).  Based on the assessment, *our management has concluded that its internal control over financial reporting was effective as of December 31, 2015* to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP.

125.    The 2015 Annual Report included certifications signed by Defendants Chen and Straughn pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, representing that the

financial statements did not contain any material misrepresentations or omissions and that disclosure controls and procedures were adequate, stating:

1. I have reviewed this Annual Report on Form 10-K of A10 Networks, Inc. for the year ended December 31, 2015;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

126. Certifications pursuant to 18 U.S.C. § 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, signed by Defendants Chen and Straughn, were also included with the 2015 Annual Report, stating:

In connection with the Annual Report on Form 10-K of A10 Networks, Inc. (the "Company") for the period ended December 31, 2015 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Lee Chen, President and Chief Executive Officer of the Company, certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

127. The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) overstated revenue for the Q4'15 and FY'15 by prematurely recognizing revenue; (ii) understated net loss for the Q4'15 and FY'15; (iii) violated A10's stated revenue recognition policies; (iv) lacked effective internal controls; and (v) as a result of (i) – (iv), A10's financial statements were not in compliance with GAAP.

**C.      False and Misleading Statements in the April 28, 2016 First Quarter 2016 Earnings Press Release and Conference Call**

128.     On April 28, 2016, A10 issued a press release announcing its first quarter 2016 financial results (the "April 2016 Press Release"), stating in relevant part:

**First Quarter 2016 Financial Highlights**

• *Revenue of $53.8 million, up 22 percent year-over-year*

• *Record enterprise revenue of $32.2 million, increased 29 percent year-over-year*

• *Strong product revenue of $36.4 million, up 19 percent year-over-year*

• *Record total deferred revenue of $74.8 million, increased 25% year-over-year*

• *Cash and marketable securities increased to $107.5 million, up from $85.6 million at March 31, 2015*

"The first quarter was a strong start to the year as we continued to build on our solid momentum," said Lee Chen, president and chief executive officer of A10 Networks. "Our high-end security product portfolio and cloud-based solutions continue to gain traction with customers and partners and this is contributing to our success in growing the business.   Additionally, with our continued topline growth and disciplined approach to managing costs, we improved our bottom line by 55% year-over-year and generated strong cash flow from operations.   We are pleased with our execution and strong first quarter results and are encouraged by our progress as we enter the second quarter."

*Total revenue for the first quarter grew to $53.8 million*, up 22 percent when compared with $44.0 million in the first quarter of 2015.  On a GAAP basis, A10 Networks reported a net loss for the first quarter 2016 of $9.5 million, or $0.15 per share, compared with a net loss of $13.7 million, or $0.22 per share, in the first quarter of 2015. Non-GAAP net loss for the first quarter of 2016 was $4.1 million, or $0.06 per share, compared with a non-GAAP net loss of $9.1 million, or $0.15 per share, in the first quarter of 2015.

A reconciliation between GAAP and non-GAAP information is contained in the financial statements below.

129.     Later that day, Defendants held the Q1'16 earnings conference call where Defendants Chen and Straughn repeated the false and misleading revenue numbers for Q1'16 as reported in the April 2016 Press Release.

130.    Following this Q1'16 earnings report, J.P. Morgan commented that "A10 bucked the generally rough tech reporting season with an inline report and guide. . . .  Overall, A10 continues to execute well and benefit from stable customers/projects."

131.    The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, financial results and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) misstated revenue due to improper revenue recognition practices; (ii) violated A10's stated revenue recognition policies; and, (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

### D.    False and Misleading Statements in the First Quarter 2016 Form 10-Q

132.    On May 5, 2016, the Company filed its quarterly report on Form 10-Q for the quarter ended March 31, 2016 (the "First Quarter 2016 Form 10-Q") with the SEC, which was signed and certified by Defendants Chen and Straughn.

133.    The First Quarter 2016 Form 10-Q included false and misleading statements regarding A10's revenue recognition practices as follows:

> Our products revenue primarily consists of revenue from sales of our hardware appliances upon which our software is installed. Such software includes our ACOS software platform plus one of our ADC, CGN, TPS or CFW solutions. Purchase of a hardware appliance includes a perpetual license to the included software. *We recognize products revenue at the time of shipment, provided that all other revenue recognition criteria have been met.* As a percentage of revenue, our products revenue may vary from quarter to quarter based on, among other things, the timing of orders and delivery of products, cyclicality and seasonality, changes in currency exchange rates and the impact of significant transactions with unique terms and conditions.

<p style="text-align:center">* * *</p>

> As a result of end-customer buying patterns and the efforts of our sales force and distribution channel partners to meet or exceed their sales objectives, we have historically received a substantial portion of purchase orders and generated a substantial portion of revenue during the last few weeks of each quarter. *We can recognize such revenue in the quarter received, however, only if all of the requirements of revenue recognition, especially shipment, are met by the end of the quarter.*

134.    The First Quarter 2016 Form 10-Q reported total revenue for the first quarter 2016 of $53.8 million.

135.    According to the First Quarter 2016 Form 10-Q, the increase in total revenues from the U.S. "was primarily attributable to increased product revenue from enterprise customers as well as higher PCS sales in connection with our increased installed customer base."  The increase in total revenues from Japan was "primarily due to higher products revenue from service provider customers."  And, the increase in total revenues from Asia Pacific regions (excluding Japan) was "primarily due to significant increases in both products and services revenue resulting from our efforts to continue expanding our presence in these regions."

136.    The First Quarter 2016 Form 10-Q falsely represented that "[t]he accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") and following the requirements of the Securities and Exchange Commission ("SEC") for interim reporting" and that A10 maintained adequate internal controls over the Company's financial reporting, stating in relevant part:

***Evaluation of Disclosure Controls and Procedures***

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as required by Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended, or the Exchange Act, as of March 31, 2016.

\* \* \*

Based upon our management's evaluation of our disclosure controls and procedures as of March 31, 2016, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, ***our disclosure controls and procedures are designed at a reasonable assurance level and are effective*** to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

***Changes in Internal Control over Financial Reporting***

> There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended March 31, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

137.   The First Quarter 2016 Form 10-Q also contained certifications signed by Defendants Chen and Straughn pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 identical to, or substantially similar to, those in the 2015 Annual Report stated above in ¶125, representing that the financial statements did not contain any material misrepresentations or omissions and that disclosure controls and procedures were adequate.

138.   Certifications pursuant to 18 U.S.C. § 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, identical to, or substantially similar to, those in the 2015 Annual Report stated above in ¶126, signed by Defendants Chen and Straughn, were also included with the First Quarter 2016 Form 10-Q.

139.   The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial results, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) misstated revenue; (ii) violated A10's stated revenue recognition policies; (iii) lacked effective internal controls; and (iv) as a result of (i) – (iii), A10's financial statements were not in compliance with GAAP.

**E.     False and Misleading Statements in the July 28, 2016 Second Quarter 2016 Earnings Press Release and Conference Call**

140.   A10 issued a press release on July 28, 2016 announcing its second quarter 2016 financial results (the "July 2016 Press Release"), stating in relevant part:

**Second Quarter 2016 Financial Highlights**

• *Record revenue of $57.1 million, up 20 percent year-over-year*

• *Enterprise revenue of $32.0 million, increased 16 percent year-over-year*

• *Product revenue of $38.8 million, up 16 percent year-over-year*

• Cash and marketable securities increased to $113.7 million, up from $96.2 million at June 30, 2015

"We delivered record revenue as our high-end security and cloud-ready Thunder solutions continued to drive growth," said Lee Chen, president and chief executive officer of A10 Networks.  "We also significantly improved our bottom-line results and we believe we are on track to meet our financial goals for the year.  In addition to our strong performance in the quarter, we took a strategic step to accelerate the A10 Harmony vision and expand our addressable market with the acquisition of Appcito.  Appcito is a cloud-native subscription service that maximizes the agility and improves the visibility and security of enterprise applications deployed in the cloud.  Appcito fits into our vision to become the most comprehensive secure application services company in the industry and helps customers become more secure and agile as they bridge traditional and cloud application environments."

***Total revenue for the second quarter grew to $57.1 million***, up 20 percent when compared with $47.5 million in the second quarter of 2015.  On a GAAP basis, A10 Networks reported a net loss for the second quarter 2016 of $4.9 million, or $0.08 per share, compared with a net loss of $10.0 million, or $0.16 per share, in the second quarter of 2015.  Non-GAAP net loss for the second quarter of 2016 was $1.1 million, or $0.02 per share, compared with a non-GAAP net loss of $5.3 million, or $0.09 per share, in the second quarter of 2015.

A reconciliation between GAAP and non-GAAP information is contained in the financial statements below.

141.    On the same day, Defendants held a conference call discussing the second quarter 2016 earnings where Defendants Chen and Straughn repeated the false and misleading revenue numbers for Q2'16 as reported in the July 2016 Press Release.

142.    Defendant Straughn continued on to state:

Moving on to our outlook, we currently expect third quarter revenue to be in the range of $58 million to $60 million.  At the mid-point, this represents 16% year-over-year revenue growth and 19% growth for the nine-month period.  We expect gross margin to remain in the 75% to 77% range and operating expenses to be between $45 million and $4 6million which includes a full quarter of expenses from the addition of Appcito.

We expect our non-GAAP bottom-line results to be between breakeven and a net loss of $0.02 per share using approximately 66 million shares on a basic and diluted basis.  For modeling purposes, I'd like to note that in the event non-GAAP operating income is positive in Q4, the non-GAAP fully diluted share count would be approximately 73 million shares.

143.    On the call, Defendant Smets attributed the "good performance year-over-year and quarter-over-quarter," in part to the channel program, stating: "So we've invested in a channel

program.  We call it Affinity channel and it is delivering, I think very, very nicely to our strategy growth, so we saw some good stability there."

144.    Dougherty & Company responded to the earnings report, reiterating its Buy rating and raising its price target from $8 to $9.  Morgan Stanley increased its price target from $6 to $8, stating, "[c]onsistency and growth have improved, meaning profitability next step to generating increase to shareholder value."

145.    The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, financial results and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) misstated revenue due to improper revenue recognition practices; (ii) violated A10's stated revenue recognition policies; (iii) as a result of (i) – (ii), the Company's business and prospects were worse than represented because as discussed at ¶¶100-107, meeting the break-even earnings could only be accomplished through improper revenue recognition practices; and, (iv) Defendants' public statements were materially false and misleading at all relevant times.

### F.    False and Misleading Statements in the Second Quarter 2016 Form 10-Q

146.    On August 5, 2016, the Company filed its quarterly report on Form 10-Q for the quarter ended June 30, 2016 (the "Second Quarter 2016 Form 10-Q") with the SEC, which was signed and certified by Defendants Chen and Straughn.

147.    The Second Quarter 2016 Form 10-Q included false and misleading statements regarding A10's revenue recognition practices as follows:

> Our products revenue primarily consists of revenue from sales of our hardware appliances upon which our software is installed. Such software includes our ACOS software platform plus one of our ADC, CGN, TPS or CFW solutions. Purchase of a hardware appliance includes a perpetual license to the included software. ***We recognize products revenue at the time of shipment, provided that all other revenue recognition criteria have been met.*** As a percentage of revenue, our products revenue may vary from quarter to quarter based on, among other things, the timing of orders and delivery of products, cyclicality and

seasonality, changes in currency exchange rates and the impact of significant transactions with unique terms and conditions.

\* \* \*

As a result of end-customer buying patterns and the efforts of our sales force and distribution channel partners to meet or exceed their sales objectives, we have historically received a substantial portion of purchase orders and generated a substantial portion of revenue during the last few weeks of each quarter. ***We can recognize such revenue in the quarter received, however, only if all of the requirements of revenue recognition, especially shipment, are met by the end of the quarter.***

148.    The Second Quarter 2016 Form 10-Q reported total revenue for the Q2'16 of $57.1 million.

149.    According to the Second Quarter 2016 Form 10-Q, revenue increases were attributable to the following:

During the second quarter of 2016, $31.3 million, or 55%, of total revenue was generated from the United States, which represents a 14% increase compared to the second quarter of 2015.  During the first half of 2016, $60.9 million, or 55%, of total revenue was generated from the United States, which represents a 21% growth compared to the first half of 2015.  These increases were primarily attributable to an overall increase in products revenue as well as higher PCS sales in connection with our increased installed customer base.

During the second quarter of 2016, $11.0 million, or 19%, of total revenue was generated from Japan, which represents a 66% increase compared to the second quarter of 2015, primarily due to higher products revenue from enterprise customers and to a less extent an increase in PCS sales in connection with the increased customer base.  During the first half of 2016, $21.8 million, or 19%, of total revenue was generated from Japan, which represents a 41% increase compared to the first half of 2015. This increase was primarily due to an overall increase in products revenue as well as higher PCS sales in connection with our increased installed customer base. In addition, total revenue from Japan during the second quarter and the first half of 2016 was increased by $0.9 million and $1.3 million, respectively, due to favorable currency exchange rates between the Japanese yen against the U.S. dollar compared to the same periods in 2015.

Total revenues from Asia Pacific regions, excluding Japan, increased by $2.2 million, or 40% and $4.3 million, or 43% in the second quarter and the first half of 2016 compared to the same periods in 2015. These increases were primarily due to significant increase in products revenue resulting from our efforts to continue expanding our presence in these regions as well as higher PCS sales in connection with our increased installed customer base.

Total revenue from EMEA decreased by $1.0 million, or 14%, and $2.1 million or 16%, in the second quarter and the first half of 2016 compared to the same periods in 2015. These decreases were primarily attributable to decreases in products revenue resulting from reduced sales and weakness in the EMEA market overall partially offset by an increase in services revenue.

150.    The Second Quarter 2016 Form 10-Q falsely represented that "[t]he accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") and following the requirements of the Securities and Exchange Commission ("SEC") for interim reporting" and that A10 maintained adequate internal controls over the Company's financial reporting, stating in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as required by Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended, or the Exchange Act, as of June 30, 2016.

\* \* \*

Based upon our management's evaluation of our disclosure controls and procedures as of June 30, 2016, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, *our disclosure controls and procedures are designed at a reasonable assurance level and are effective* to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended June 30, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

151.    The Second Quarter 2016 Form 10-Q also contained certifications signed by Defendants Chen and Straughn pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

identical to, or substantially similar to, those in the 2015 Annual Report stated above in ¶126, representing that financial statements did not contain any material misrepresentations or omissions and that disclosure controls and procedures were adequate.

152.   Certifications pursuant to 18 U.S.C. § 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, identical to, or substantially similar to, those in the 2015 Annual Report stated above in ¶126, signed by Defendants Chen and Straughn, were also included with the Second Quarter 2016 Form 10-Q.

153.   The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial results, which were known to Defendants or recklessly disregarded by them.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) misstated revenue; (ii) violated A10's stated revenue recognition policies; (iii) lacked effective internal controls; and (iv) as a result of (i) – (iii), A10's financial statements were not in compliance with GAAP.

**G.     False and Misleading Statements in the October 27, 2016 Third Quarter 2016 Earnings Press Release and Conference Call**

154.   On October 27, 2016, A10 issued a press release announcing its third quarter 2016 financial results (the "October 2016 Press Release"), stating in relevant part:

> ***Total revenue for the third quarter grew to $55.1 million, up 8 percent when compared with $50.8 million in the third quarter of 2015.  On a GAAP basis, A10 Networks reported a net loss for the third quarter 2016 of $4.7 million, or $0.07 per share, compared with a net loss of $9.0 million, or $0.14 per share, in the third quarter of 2015.  Non-GAAP net income for the third quarter of 2016 was $0.2 million, or $0.00 per share, compared with a non-GAAP net loss of $4.4 million, or $0.07 per share, in the third quarter of 2015.*** A reconciliation between GAAP and non-GAAP information is contained in the financial statements below.
>
> ***"We reported third quarter revenue of $55.1 million, which was below our guidance and reflects a shortfall in North America where we received a couple orders too late in the quarter to ship and some deals slipped into future quarters,"*** said Lee Chen, president and chief executive officer of A10 Networks.  "While we are disappointed with our topline performance, we continued to drive leverage in our operating model, significantly improve our bottom-line results and invest in key areas of our business to foster long-term growth.   The share repurchase

authorization announced today reflects our confidence in our market opportunities and ability to meet our financial objectives."

155.    On the same day, Defendants held a conference call to discuss the third quarter 2016 earnings.   Defendants Chen and Straughn repeated the false and misleading revenue and net loss/income numbers for the Q3'16 as reported in the October 2016 Press Release.   Defendant Chen stated that for the quarter the Company had "reached non-GAAP breakeven."

156.    Defendant Straughn stated:

Moving on to our outlook, *we currently expect fourth quarter revenue to be in the range of $59 million to $63 million.  At the mid-point, this represent 8% year-over-year revenue growth for the quarter and 16% growth for the full year.*  We expect gross margin to remain in the 75% to 77% range, and operating expenses to be between $44.5 million and $45.5 million.  *We expect our non-GAAP bottom-line results to be between breakeven and earnings of $0.04 per share using approximately 75.1 million shares on a basic and diluted basis.*

157.    Defendant Chen ascribed the disappointing revenue results to "lower than expected product bookings in North America, where we received a couple orders too late in the quarter to ship and some deals slipped into future quarters.   These deals were both in our enterprise and service provider customer verticals and remain in our pipeline."   Chen buttressed his comments, stating that the Company was "closely engaged with these customers and we expect these transactions to be closed in either Q4 or Q1."   Defendant Straughn confirmed this, stating: "As Lee mentioned, the revenue shortfall was primarily in North America where product bookings came in lower than we had expected."

158.    Analysts asked pointed questions regarding the "couple orders" resulting in the low revenues for the quarter:

**<Q - Dariush Ruch-Kamgar>:** Questions on the deal push outs, wondering are these customers that typically purchase every quarter or two, so does this -- and what I'm trying to ask is, does this represent slower total growth for next couple of quarters? And are there any similarities between the customers that you're seeing or why they pushed out orders?

**<A - Greg Straughn>:** Hi, Dariush, this is Greg. So first of all, all of the deals that we saw that moved out of the quarter were with existing customers. And so they are customers where we have ongoing relationships and I won't go so far to say they buy every quarter, but they are usual suspects for us. And so, we know pretty well what deals are going to close but it's the time that becomes the issue

and that's 'what we saw this quarter. ***So, I don't think this points to any kind of larger trend for us. It was an isolated group of customers and I don't think there'd be any common thread we can point to as to either why they pushed out or what they were buying or what they were, I guess, the process they were going through.***

\* \* \*

**<Q - Ryan M. Flanagan>:** Hi, thanks guys. It's Ryan on for [ph] Ro (31:43). I'd a question on the guidance. It looks like the little bit of wider range than normal. Does that imply any sort of variability on pipeline visibility or some uncertainty around closing these deals, any color on the rationale behind that? Thanks.

**<A - Greg Straughn>:** Sure, this is Greg. I think that certainly coming off of a quarter in Q3 where we had some deals into the quarter that didn't cross the line as we expected, leads you to think about how you do Q4 as well. And so, I think we just want to give ourselves a little bit flexibility in dealing with that variability. Q4 has traditionally been a big quarter for us. And so, we want to give ourselves room to exceed but also have to be realistic on what we saw in Q3 and factor that in.

\* \* \*

**<Q>:** Hey guys, this is [ph] RK (37:05) again. I just wanted to check with you, could you give us any color on the magnitude of the two push-outs you saw this quarter and also to what extent is that they are reflected in your guidance for Q4?

**<A - Greg Straughn>:** So the magnitude of the push outs and to the extent they're projected into guidance. So on the magnitude, kind of in two different reactions. One is that from a deal size, they tended to be $0.5 million to $1.5 million deals. So not small deals but not mega deals that we sometimes run across. And there a handful of them. So, there were a very clearly identifiable group of accounts that were we focused on. When we look at guidance for Q4, ultimately we go through the same process that we go through every quarter. I've talked few times about the layer cake that we build up starting with the services that we know are coming in, looking at our backlog, looking at deals that work, and then going to our evaluation process. So these deals go through that same analysis. I mean, they likely have a higher probability because we are closer on them than are some of the others.

But they kind of go into that same analysis that we look at. They don't get special treatment necessarily. So, we would expect to think as we said, some of them -- most in the close in Q4, may be one or two goes to Q1 but they're factored in, we think appropriately to Q4.

159.    On this news, A10's stock price fell almost 17% from a closing price of $8.99 per share on October 27, 2016 to close at $7.47 per share on October 28, 2016 on heavy trading volume of over 3.7 million shares.

160.    Analysts accepted Defendants' reasons for the weak quarter and false and misleading "non-GAAP breakeven."  Buckingham Research Group maintained its rating and price target, stating: "ATEN delivered 3Q revenue miss on a handful of slipped deals, however, disciplined expense management drove operating income and breakeven EPS."   J.P. Morgan similarly stated: "A10 reported a weak quarter and guide as management indicated a handful of unrelated customer order delays in North America.   However, the company achieved EBIT breakeven as promised. . . .  We continue to believe that the company has solid growth prospects."

161.    The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, financial results and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) overstated revenue for the Q3'16 by prematurely recognizing revenue; (ii)  overstated the non-GAAP operating income, net income for the Q3'16 changing a loss into income; (iii) violated A10's stated revenue recognition policies; (iv) as, a result of (i) – (iii) the Company's business and prospects were worse than represented because as discussed at ¶¶100-113, meeting the break-even earnings could only be accomplished through improper revenue recognition practices; and, (v) Defendants' public statements were materially false and misleading at all relevant times.

**H.    False and Misleading Statements in the Third Quarter 2016 Form 10-Q**

162.    On November 3, 2016, the Company filed its quarterly report on Form 10-Q for the quarter ended September 30, 2016 (the "Third Quarter 2016 Form 10-Q") with the SEC, which was signed and certified by Defendants Chen and Straughn.

163.    The Third Quarter 2016 Form 10-Q included false and misleading statements regarding A10's revenue recognition practices as follows:

Our products revenue primarily consists of revenue from sales of our hardware appliances upon which our software is installed. Such software includes our ACOS software platform plus one of our ADC, CGN, TPS, and CFW solutions. Purchase of a hardware appliance includes a perpetual license to the included software. *We recognize products revenue at the time of shipment, provided that all other revenue recognition criteria have been met.* As a percentage of revenue, our products revenue may vary from quarter to quarter based on, among other things, the timing of orders and delivery of products, cyclicality and seasonality, changes in currency exchange rates and the impact of significant transactions with unique terms and conditions.

\* \* \*

As a result of end-customer buying patterns and the efforts of our sales force and distribution channel partners to meet or exceed their sales objectives, we have historically received a substantial portion of purchase orders and generated a substantial portion of revenue during the last few weeks of each quarter *We can recognize such revenue in the quarter received, however, only if all of the requirements of revenue recognition, especially shipment, are met by the end of the quarter.*

164.    The Third Quarter 2016 Form 10-Q reported total revenue of $55.1 million and a net loss of $4.7 million for the third quarter 2016.

165.    The Third Quarter 2016 Form 10-Q also falsely represented that "[t]he accompanying unaudited Condensed Consolidated Financial Statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") and following the requirements of the Securities and Exchange Commission ("SEC") for interim reporting" and that A10 maintained adequate internal controls over the Company's financial reporting, stating in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as required by Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended, or the Exchange Act, as of September 30, 2016.

\* \* \*

Based upon our management's evaluation of our disclosure controls and procedures as of September 30, 2016, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance

that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

***Changes in Internal Control over Financial Reporting***

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended September 30, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

166.    The Third Quarter 2016 Form 10-Q contained certifications signed by Defendants Chen and Straughn pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, identical to, or substantially similar to, those in the 2015 Annual Report stated above in ¶125, representing that the financial statements did not contain any material misrepresentations or omissions and that disclosure controls and procedures were adequate.

167.    Certifications pursuant to 18 U.S.C. § 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, identical to, or substantially similar to, those in the 2015 Annual Report stated above in ¶126, signed by Defendants Chen and Straughn, were also included with the Third Quarter 2016 Form 10-Q.

168.    The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial results, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) overstated revenue for the Q3'16 by prematurely recognizing revenue; (ii) understated net loss for the Q3'16; (iii) violated A10's stated revenue recognition policies; (iv) lacked effective internal controls; and (iv) as a result of (i) – (iv), A10's financial statements were not in compliance with GAAP.

**I.      False and Misleading Statements in the February 9, 2017 Fourth Quarter and Year-End 2016 Earnings Press Release and Conference Call**

169.    On February 9, 2017, A10 issued a press release announcing its fourth quarter and year-end 2016 financial results and disclosing that Defendant Straughn would be stepping down as CFO (the "February 2017 Press Release"), stating in relevant part:

**Fourth Quarter 2016 Financial Summary**

• *Record revenue of $64.0 million, grew 13 percent year-over-year*

• *GAAP net loss of $1.8 million or $0.03 per share*

• *Non-GAAP net income of $2.3 million or $0.03 per share*

**Year 2016 Financial Summary**

• *Record revenue of $230.0 million, grew 16 percent over 2015*

• *GAAP net loss of $20.9 million or $0.32 per share*

• *Non-GAAP net loss of $2.7 million or $0.04 per share*

• *Deferred revenue grew 28 percent year-over-year to reach $92.9 million*

• Ended the year with $114 million in cash, cash equivalents and marketable securities, an increase of $16 million from last year

A reconciliation between GAAP and non-GAAP information is contained in the financial statements below.

*"The fourth quarter was a strong close to the year with revenue exceeding guidance and growing 13 percent year-over-year to reach $64 million. Our record performance was driven by strong demand for our security solutions and continued expansion with cloud provider, service provider and web-scale customers,"* said Lee Chen, president and chief executive officer of A10 Networks. "We also continued to drive leverage through our operating structure to make significant improvements in our bottom-line results, while at the same time, investing in key areas of our business."

**Management Transition**

A10 Networks announced that Greg Straughn has decided to step down from the role of CFO effective as of the filing of the company's 10-K.  Straughn will remain with the company as an advisor until April to help facilitate a smooth transition. The board of directors has appointed Shiva Natarajan as the company's interim CFO effective upon Straughn's resignation.  The company has initiated a search for a successor to Straughn.

170.    Also on February 9, 2017, the Company held an investor conference call to discuss A10's fourth quarter and year-end 2016 financial results.  Defendants Chen and Straughn repeated the same false and misleading revenue and net loss/income numbers for the fourth quarter and year-end 2016 as reported in the February 2017 Press Release.  Defendant Chen stated:

> Across the board, the A10 team executed and reached several new records including: ***record product revenue of $43.5 million, up 23% over Q3 and 10% over last year. Record security revenue, record revenue in the U.S., which grew 38% over Q3 and 6% year-over-year to reach $33.5 million.*** Record bookings, which led to the highest backlog in our history, and record deferred revenue of $92.9 million, which grew 28% year-over-year.

> Our record performance was driven by continued expansion within cloud provider, service provider and web-scale customers, as well as strong demand for our security solutions, including our recently launched Thunder 14045 security appliance.

> * * *

> ***In short, our strategy is working. For the full-year, we grew revenue 16% to reach $230 million. We exceeded our goal for security product revenue in this year. And we expect our security product revenue to be over 20% of our total product revenue in 2017.***

> We achieved these results while driving leverage through our model and significantly improving our bottom line. ***We reduced our non-GAAP net loss by 88% and met our goal to deliver a profit in the fourth quarter.*** With the top-line growth and continued focus on financial discipline, we expect to expand our profitability in 2017, and we remain committed to reach our target operating model by 2019.

171.    Defendant Straughn reiterated the revenue break-downs and went on to explain the following:

> We achieved ***non-GAAP net income of $2.3 million or $0.03 per diluted share, which was at the high-end of our guided range of breakeven to $0.04 of earnings.*** In the fourth quarter, we incurred a $2.4 million expense, or $0.03 per share, due to the unexpected, post-election movement in the yen to dollar exchange rate.  This expense is reflected in the other expense line in our income statement.

> ***Our net income performance this quarter represents a significant improvement from a net loss of $3.7 million in Q4 of last year, bringing our full year bottom line improvement to 88% on a per share basis.***

> Diluted weighted shares used for computing EPS for the fourth quarter were approximately 73.1 million shares, while basic shares outstanding for computing the net loss for the 2016 year were 65.7 million shares.

172.     Analyst Ittai Kidron of Oppenheimer questioned the Individual Defendants on the source of their successful quarter and year-end:

> **&lt;Q - Ittai Kidron&gt;:** Hi, guys.  Congrats on good numbers and Greg, sorry to see you leave.  Maybe you could talk a little bit about the outperformance, how much of it in the quarter was really the deals that got delayed, that closed, I mean your master capture, what kind of slipped through last quarter versus the upside driven by new business transactions, if you can give us some color, that will be great.

> **&lt;A - Greg Straughn&gt;:** Sure.  Of the deals that we had talked about at the end of the Q3, some of those did close in Q4, some of those are in the pipeline and we would expect to close in Q1.  But I think the key thing to note is that we had massively strong bookings within the quarter.  I mean we talked about a $90 million backlog, which is well beyond anything we've seen before. And so, the traction within the quarter was where the quarter was made.  So some of those deals are in revenue, but the real story for our business traction is the record bookings and have that contributed to backlog.

> **&lt;Q - Ittai Kidron&gt;:** When you look at that backlog, are there large deals in there that are making the jump like this or is it pretty widely distributed?

> **&lt;A - Greg Straughn&gt;:** There is a combination.  I mean there it's not all small deals.  There are some good-sized transactions in there and that backlog will likely come into revenue, not all Q1, there will be some spread to it, but we're really very, very pleased with the quantity and the quality of that backlog.

> **&lt;Q - Ittai Kidron&gt;:** Got it. And then, Lee – go ahead.

> **&lt;A - Lee Chen&gt;:** The backlog is from many customers.

173.     As expected, analysts and investors reacted favorably to the Defendants' earnings report.  The Company's stock price increased from a closing price of $8.60 per share on February 9, 2017 to close at $9.52 per share on February 10, 2017 on heavy trading volume of over 1.7 million shares.

174.     Dougherty & Company called A10's results "surprisingly strong," concluding: "Ultimately, the company significantly outperformed expectations and we believe traction with their higher-end appliance bodes well for future periods."   J.P. Morgan increased its revenue estimates "driven by the beat in the quarter as well as the solid guidance."

175.     The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's

business, operations, financial results and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) overstated revenue for the Q4'16 and FY'16 by prematurely recognizing revenue; (ii) understated GAAP operating losses, net loss, and net loss per share for the FY'16 and Q4'16; and(iii) overstated non-GAAP operating income, net income, and net income per share for the Q4'16 and FY'16, changing an operating loss, net loss, and net loss per share into income for Q4'16; (iv) violated A10's stated revenue recognition policies; (iv) as, a result of (i) – (iv) the Company's business was worse than represented; and, (v) Defendants' public statements were materially false and misleading at all relevant times.

**J.     False and Misleading Statements in the 2016 Annual Report**

176.    On February 24, 2017, the Company filed its Annual Report on Form 10-K with the SEC for the year-ended December 31, 2016 (the "2016 Form 10-K") which was signed and certified by Defendants Chen and Straughn.

177.    The 2016 Form 10-K falsely represented that A10 recognized revenue as follows:

***Revenue Recognition***

We derive revenue from two sources: (i) products revenue, which includes hardware and perpetual software license revenue; and (ii) services revenue, which include post contract support ("PCS"), professional services, and training. A substantial portion of our revenue is from sales of our products and services through distribution channel partners, such as resellers and distributors. Revenue is recognized, net of applicable taxes, when all of the following criteria are met: persuasive evidence of an arrangement exists, delivery or performance has occurred, the sales price is fixed or determinable, and collection is reasonably assured.

We define each of the four criteria above as follows:

• ***Persuasive evidence of an arrangement exists.*** Evidence of an arrangement consists of a purchase order issued pursuant to the terms and conditions of a master sales agreement.

• ***Delivery or performance has occurred.*** We use shipping documents or written evidence of customer acceptance, when applicable, to verify delivery or performance. We recognize product revenue upon transfer of title and risk of loss, which primarily is upon shipment to customers. We do not have significant obligations for future performance, such as customer acceptance provisions, rights of return, or pricing credits, associated with our sales.

• ***The sales price is fixed or determinable.*** We assess whether the sales price is fixed or determinable based on payment terms and whether the sales price is subject to refund or adjustment. Standard payment terms to customers range from 30 to 90 days.

• ***Collection is reasonably assured.*** We assess probability of collection on a customer-by-customer basis. Our customers are subjected to a credit review process that evaluates their financial condition and ability to pay for products and services.

PCS revenue includes arrangements for software support and technical support for our products.  PCS is offered under renewable, fee-based contracts, which include technical support, hardware repair and replacement parts, bug fixes, patches, and unspecified upgrades on a when-and-if available basis.  Revenue for PCS services is recognized on a straight-line basis over the service contract term, which is typically one year, but can be up to five years.  Unearned PCS revenue is included in deferred revenue.

Professional service revenue primarily consists of the fees we earn related to installation and consulting services.  We recognize revenue from professional services upon delivery or completion of performance.  Professional service arrangements are typically short term in nature and are largely completed within 30 to 90 days from the start of service.

178.    The 2016 Form 10-K also included the following additional statements pertaining to A10's revenue recognition policies:

As a result of end-customer buying patterns and the efforts of our sales force and distribution channel partners to meet or exceed their sales objectives, we have historically received a substantial portion of purchase orders and generated a substantial portion of revenue during the last few weeks of each quarter.  ***We can recognize such revenue in the quarter received, however, only if all of the requirements of revenue recognition, especially shipment, are met by the end of the quarter.***

* * *

Our products revenue primarily consists of revenue from sales of our hardware appliances upon which our software is installed. Such software includes our ACOS software platform plus one of our ADC, CGN, TPS, SSLi or CFW solutions. Purchase of a hardware appliance includes a perpetual license to the included software. ***We recognize products revenue at the time of shipment, provided that all other revenue recognition criteria have been met.***

179.    The 2016 Form 10-K reported total revenue for the fourth quarter and year-end 2016 as $64 million and $230 million, respectively, and a GAAP net loss of $1.8 million and $20.9 million, respectively.

180.   According to the 2016 Form 10-K, the increase in total revenues was attributable to following:

> During 2016, $118.8 million, or 52%, of total revenue was generated from the United States, which represents an 11% increase in revenue as compared to 2015. The increase was primarily due to higher products revenue as well as higher PCS sales in connection with our increased installed customer base.
>
> During 2016, $53.0 million, or 23%, of total revenue was generated from Japan, which represents a 49% increase in revenue as compared to 2015. The increase was primarily due to higher revenue from service provider customers and expansion to new customers in Japan. In addition, the favorable currency exchange impact of the Japanese yen on products revenue was $4.5 million during 2016.
>
> During 2016, $29.8 million, or 13%, of total revenue was generated from the Asia Pacific regions excluding Japan, which represents a 25% increase in revenue as compared to 2015. The increase was primarily due to higher products revenue resulting from our continuous efforts in expanding our presence in these regions as well as higher PCS sales in connection with our increased installed customer base.
>
> During 2016, $23.1 million, or 10%, of total revenue was generated from EMEA, which represents a 15% decrease in revenue as compared to 2015. The decrease was primarily due to lower products revenue as a result of overall economic weakness and uncertainty in the EMEA markets as well as personnel turnover in our Middle East operations, partially offset by an increase in services revenue.

181.   A10 also reported that revenue fulfilled through distribution channel partners accounted for 85% of the total revenue for 2016.

182.   The 2016 Form 10-K falsely represented that "[w]e have prepared the accompanying consolidated financial statements in accordance with [GAAP] and pursuant to the rules and regulations of the [SEC]" and that A10 maintained adequate internal controls over the Company's financial reporting, stating in relevant part:

> ***Evaluation of Disclosure Controls and Procedures***
>
> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as required by Rule 13a-15(b) under the Securities Exchange Act of 1934 as of December 31, 2016.
>
> * * *
>
> Based upon our management's evaluation of our disclosure controls and procedures as of December 31, 2016, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures are designed

at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

***Management's Report on Internal Control over Financial Reporting***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act).  Our management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria set forth in Internal Control-Integrated Framework issued by the

Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).  Based on the assessment, our management has concluded that its internal control over financial reporting was effective as of December 31, 2016 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP.  Our independent registered public accounting firm, Deloitte & Touche, LLP, is not required to and has not issued a formal attestation report as of December 31, 2016 and will not be required to do so until the year following the date that we are no longer an emerging growth company as defined in the JOBS Act.

***Changes in Internal Control over Financial Reporting***

There were no changes in our internal control over financial reporting during the quarter ended December 31, 2016 that have materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

183.    The 2016 Form 10-K included certifications signed by Defendants Chen and Straughn, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, identical to, or substantially similar to, those in the 2015 Annual Report stated above in ¶125, representing that financial statements did not contain any material misrepresentations or omissions and that disclosure controls and procedures were adequate.

184.    Certifications pursuant to 18 U.S.C. § 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, identical to, or substantially similar to, those in the 2015 Annual Report stated above in ¶126, signed by Defendants Chen and Straughn, were also included with the 2016 Form 10-K.

185.    The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial results, which were known to Defendants or recklessly disregarded by them.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) overstated revenue for the Q4'16 and FY'16 by prematurely recognizing revenue; (ii) understated GAAP operating losses, net loss, and net loss per share for the Q4'16 and FY'16; (iii) violated A10's stated revenue recognition policies; (iv) lacked effective internal controls; and (v) as a result of (i) – (iv), A10's financial statements were not in compliance with GAAP.

**K.    False and Misleading Statements in the April 27, 2017 First Quarter 2017 Earnings Press Release and Conference Call**

186.    On April 27, 2017, A10 issued a press release announcing its first quarter 2017 financial results (the "April 2017 Press Release"), stating in relevant part:

> **First Quarter 2017 Financial Summary**
>
> • *Revenue of $60.3 million, grew 12 percent year-over-year*
>
> • *GAAP net loss of $3.9 million or $0.06 per share*
>
> • Non-GAAP net income of $0.7 million or $0.01 per share
>
> A reconciliation between GAAP and non-GAAP information is contained in the financial statements below.
>
> "The first quarter was a solid start to the year with revenue growth driven by our security and cloud-focused solutions gaining momentum among cloud provider, service provider and web-scale customers," said Lee Chen, president and chief executive officer of A10 Networks.   "We believe the cloud presents a long-term growth opportunity for A10, and we are focused on bringing new solutions to market that give customers the visibility, agility, flexibility and security they need for their cloud deployments."

187.    Later that same day, Defendants hosted an earnings conference for analysts and investors where Defendants Chen and Natarajan repeated the same false and misleading revenue numbers for the Q1'17 as reported in the April 2017 Press Release.

188.    The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's

business, operations, financial results and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) misstated revenue due to improper revenue recognition practices; (ii) violated A10's stated revenue recognition policies; and, (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**L.     False and Misleading Statements in the First Quarter 2017 Form 10-Q**

189.    On May 5, 2017, A10 filed its quarterly report on Form 10-Q for the quarter ended March 31, 2017 (the "First Quarter 2017 Form 10-Q") with the SEC, which was signed and certified by Defendants Chen and Natarajan.

190.    The First Quarter 2017 Form 10-Q included false and misleading statements regarding A10's revenue recognition practices as follows:

> Our products revenue primarily consists of revenue from sales of our hardware appliances upon which our software is installed.  Such software includes our ACOS software platform plus one of our ADC, CGN, TPS, SSLi or CFW solutions. Purchase of a hardware appliance includes a perpetual license to the included software.  ***We recognize products revenue at the time of shipment, provided that all other revenue recognition criteria have been met.***  As a percentage of revenue, our products revenue may vary from quarter to quarter based on, among other things, the timing of orders and delivery of products, cyclicality and seasonality, changes in currency exchange rates and the impact of significant transactions with unique terms and conditions.

> *       *       *

> As a result of end-customer buying patterns and the efforts of our sales force and distribution channel partners to meet or exceed their sales objectives, we have historically received a substantial portion of purchase orders and generated a substantial portion of revenue during the last few weeks of each quarter.  ***We can recognize such revenue in the quarter received, however, only if all of the requirements of revenue recognition, especially shipment, are met by the end of the quarter.***

191.    The First Quarter 2017 Form 10-Q reported total revenue for the first quarter 2017 of $60.3 million.

192.    Revenue was attributed to the following:

> During the first quarter of 2017, $30.7 million, or 51% of total revenue, was generated from the United States, which represents a 4% increase as compared to the same period of 2016.  The increase was primarily due to higher services revenue

attributable to the increase in PCS sales in connection with our increased installed customer base.

During the first quarter of 2017, $13.1 million, or 22% of total revenue, was generated from Japan, which represents a 20% increase as compared to the same period of 2016. The increase was primarily due to higher products revenue and higher services revenue from PCS sales in connection with renewals.

During the first quarter of 2017, $10.2 million, or 17% of total revenue, was generated from Asia Pacific regions excluding Japan, which represents a 52% increase as compared to the same period of 2016. The increase was primarily due to higher products revenue.

During the first quarter of 2017, $5.2 million, or 8% of total revenue, was generated from EMEA, which represents a 3% increase as compared to the same period of 2016. The increase was primarily due higher services revenue, partially offset by lower products revenue as a result of overall economic weakness and uncertainty in the EMEA markets.

193.   The First Quarter 2017 Form 10-Q also falsely represented that A10 "prepared the accompanying unaudited condensed consolidated financial statements pursuant to the rules and regulations of the [SEC]" and that the "condensed consolidated financial statements are prepared in accordance with U.S. GAAP." The First Quarter 2017 Form 10-Q claimed that A10 maintained adequate internal controls over the Company's financial reporting, stating in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Interim Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as required by Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended, or the Exchange Act, as of March 31, 2017.

* * *

Based upon our management's evaluation of our disclosure controls and procedures as of March 31, 2017, our Chief Executive Officer and Interim Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Interim Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

*Changes in Internal Control over Financial Reporting*

There were no changes in our internal control over financial reporting during the quarter ended March 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

194.    The First Quarter 2017 Form 10-Q also contained certifications signed by Defendants Chen and Natarajan, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, identical to, or substantially similar to, those in the 2015 Annual Report stated above in ¶125, representing that financial statements did not contain any material misrepresentations or omissions and that disclosure controls and procedures were adequate.

195.    Certifications pursuant to 18 U.S.C. § 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, identical to, or substantially similar to, those in the 2015 Annual Report stated above in ¶126, signed by Defendants Chen and Natarajan, were also included with the First Quarter 2017 Form 10-Q.

196.    The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial results, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) misstated revenue due to improper revenue recognition practices; (ii) violated A10's stated revenue recognition policies; (iii) lacked effective internal controls; and (iv) as a result of (i) – (iii), A10's financial statements were not in compliance with GAAP.

VI.    **THE TRUTH BEGINS TO EMERGE THROUGH PARTIAL CORRECTIVE DISCLOSURES WHILE DEFENDANTS CONTINUE TO ISSUE FALSE AND MISLEADING STATEMENTS**

A.    **False and Misleading Statements in the July 13, 2017 Preliminary Second Quarter 2017 Earnings Press Release**

197.    On July 13, 2017, A10 uncharacteristically issued a press release announcing preliminary second quarter 2017 financial results, stating in relevant part:

A10 Networks expects ***total revenue in the second quarter 2017 to be between $52.5 million and $53.5 million, below its prior guidance of $62.0 million to $64.0 million.  The company expects to report a GAAP net loss between $0.12 and $0.13***

*per share.*  On a non-GAAP basis, the company expects to report a net loss between $0.05 and $0.06 per share, using approximately 69.8 million basic shares, which is below the previous guidance for non-GAAP net income of $0.01 to $0.03 per share, using approximately 76.6 million diluted shares.   A preliminary reconciliation between GAAP and non-GAAP information is contained in the financial statements below.

*"We are disappointed with our preliminary results. Revenue came in below our guidance as a number of opportunities in our pipeline did not close primarily in North America and to a lesser degree in Japan.*  Key deals remain in our pipeline and we are diligently working to improve our execution," said Lee Chen, president and chief executive officer of A10 Networks.   "We remain confident that our investments in security and cloud will serve as a strong foundation to penetrate these faster-growing segments of our market."

These are preliminary results and remain subject to the completion of the company's customary quarterly close and review procedures.  Material adjustments may arise between the date of this press release and the dates on which A10 Networks announces its full second quarter 2017 results and files its Form 10-Q for the period with the SEC.

198.   On this news, A10's stock price fell 16% from a closing price of $8.24 per share on July 13, 2017 to close at $6.92 per share on July 14, 2017 on heavy trading volume of over 5.3 million shares.  As set forth herein, artificial inflation in A10's stock price was removed when concealed risks materialized and/or the truth about the material misrepresentations and omissions was partially revealed to the public on July 13, 2017.  *See* Section VIII.A, *infra*.

199.   While analysts reacted to A10's disappointing results, once again Defendants' false assurances hit their mark.  Dougherty & Company reduced its price target from $10.50 to $8.50, but remained positive: "While purchase delays are concerning, the company has a well-established install base in large-scale environments . . . where revenue tends to be lumpy. . . .  We believe the company has a few deals in the pipeline that will pull though [sic] by year end and therefore, maintaining our Buy rating."

200.   Despite disclosing revenue guidance shortfalls, the above statements continued to be materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, financial results and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had

admittedly: (i) understated revenue due to improper revenue recognition practices; (ii) violated A10's stated revenue recognition policies; and, (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**B.    False and Misleading Statements in the July 27, 2017 Second Quarter 2017 Earnings Press Release and Conference Call**

201.    On July 27, 2017, A10 issued a press release announcing its final second quarter 2017 financial results (the "July 27, 2017 Press Release"), stating in relevant part:

**Second Quarter 2017 Financial Summary**

- ***Revenue of $53.7 million, compared with $57.1 million in second quarter 2016***

- ***GAAP net loss of $8.3 million or $0.12 per basic share***

- Non-GAAP net loss of $3.1 million or $0.04 per basic share

    A reconciliation between GAAP and non-GAAP information is contained in the financial statements below.

***"We are disappointed with our second quarter results as a number of opportunities in our pipeline did not close in the quarter, which impacted our revenue.  We are implementing a number of cross-functional actions to improve our execution, increase the effectiveness of our go-to-market activities and support growth for our expanding product portfolio,"*** said Lee Chen, president and chief executive officer of A10 Networks.  "A10 has a deep heritage in ultra-high-performance networks that we are leveraging to expand into new markets - cloud and security.  With our marquee customer base and continued innovation, we believe we are establishing a strong foundation to penetrate these faster-growing markets and drive growth and shareholder value."

202.    On the same day, Defendants participated in an earnings conference call to discuss A10's final second quarter 2017 financial results.  Defendants Chen and Constantino repeated the same false and misleading revenue numbers for the Q2'17 as reported in the July 27, 2017 Press Release.

203.    Defendant Chen attributed the disappointing results to "a number of opportunities in all pipeline . . . not clos[ing] in the quarter" adding that the Company "ha[s] commenced a thorough review and analysis of our performance this quarter, and we are taking action to improve our execution and support growth for our expanding product portfolio."

204.    Not surprisingly, analysts questioned the source of A10's revenue weakness:

**<Q>:** And then following-up on that.  If your win rates remained strong, I'm just trying to understand what drove the weakness.  You mentioned that some of the deals did not close and you're commencing a total review.  I just wanted to make sure I get some clarity on that.  Can you give more – can you be more specific there on what exactly are you reviewing?  ***Did you find some problems with your sales engineering team or you don't have enough – right resources or the right processes to respond to the [ph] RFPs? (22:49) Can you give us more specifics around that, please?***

**<A>: Lee Chen>:** Yes, I think we have [ph] B2B (22:55) through approximately a dozen sizable deals.  ***We thought it will close in the quarter and they did not, right. We also realized we need to improve our execution and taking action to do that. So, they are viewing each of our key regions but mostly in the U.S. and Japan.*** They're including both service provider and enterprise customers across our product line. I think Ray you can add more color.

**<A>: Raymond J. Smets>:** Yes, happy to [ph] Ashwin. (23:23)  So, just referring back to the deals, there are a handful of deals that we're tracking in the quarter that we didn't close, although we expected them to close.  And all of the deals had their own particular characteristics.  So, there was not anyone reason why we saw these deals move from Q2 into Q3.  The good news is we have closed them in the current quarter and most of those remain in the pipeline, also actively and diligently working to be closed in the current quarter as well.  But many of our large deals are highly complex and obviously are quite technical in nature that have to go through POX in order to close.  This is very, very typical in the kind of market that we're dealing with.

And as we're tracking these deals, we try to estimate as to when they may come in. But, once again, they all have their own characteristics.  Some of the characteristics are issues that we run into or out our control.  Some of them are in our control and the areas where we can do better is exactly where we're focused on.

\* \* \*

**<Q>: Mark Kelleher>:** Okay. And you talked about a number of deals, a handful of deals that flipped out. Are you seeing that hesitancy continue into Q3?  Are there deals that you factored into your guidance that you think have flipped from Q3 to Q4?

**<A>: Lee Chen>:** Yes, we absolutely are factoring into the longer sales cycle. We're definitely expecting to for our guidance.  But Ray probably can provide more of these.

**<A>: Raymond J. Smets>:** Yes. So, just commenting on those deals that slipped, we've actually initiated a pretty thorough review analysis to try to really get under this.  If the deals that we're closing there are fairly complex in nature and, like I had mentioned earlier, their complex for a number of different reasons, some things we can control and some things we can't.  So, we've identified some initial actions that

we want to take some action around to improve execution.  One area is around making sure that our sales organization is more trained to sell in this particularly increasingly complex environment.  And we're also looking at ways to improve cross-functional measures to improve the products and create a more simplified product, so that we can sell.  But one of the benefits we have as a small company is we're very nimble.  We can take and implement these actions very, very quickly and maybe even faster than some large companies.  And we're pretty optimistic that the deals that sit in the pipeline are convertible in this quarter and beyond.

**\<A\>: Lee Chen\>:** Yes. I think the good thing is most remain in the pipeline and we already closed out the deal.

**\<Q\>: Mark Kelleher\>:** So, it's an increased sales cycle.  That's kind of the issue, it's taking longer to close these complicated deals?  And you're factoring that again into the next quarter guidance, is that correct?

**\<A\>: Lee Chen\>:** Yes. Yes.

**\<A\>: Tom Constantino\>:** Yeah. I don't see – I would say – this is Tom.  The timing of when those deals may close is definitely not determined.  And so, we may not see those in the quarter.  But as we set guidance we looked across all other deals, we try to take a very measured approach to what we could expect in terms of conversion rate of our pipeline and we added an extra level of caution when we prepared our guidance taking that into consideration.

205.   The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, financial results and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) understated revenue due to improper revenue recognition practices; (ii) violated A10's stated revenue recognition policies; and, (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**C.      False and Misleading Statements in the Second Quarter 2017 Form 10-Q**

206.   On August 3, 2017, A10 filed its quarterly report on Form 10-Q for the quarter ended June 30, 2017 (the "Second Quarter 2017 Form 10-Q") with the SEC, which was signed and certified by Defendants Chen and Constantino.

207.   The Second Quarter 2017 Form 10-Q included false and misleading statements regarding A10's revenue recognition practices as follows:

Our products revenue primarily consists of revenue from sales of our hardware appliances upon which our software is installed. Such software includes our ACOS software platform plus one of our ADC, CGN, TPS, SSLi or CFW solutions. Purchase of a hardware appliance includes a perpetual license to the included software. *We recognize products revenue at the time of shipment, provided that all other revenue recognition criteria have been met.* As a percentage of revenue, our products revenue may vary from quarter to quarter based on, among other things, the timing of orders and delivery of products, cyclicality and seasonality, changes in currency exchange rates and the impact of significant transactions with unique terms and conditions.

\* \* \*

As a result of end-customer buying patterns and the efforts of our sales force and distribution channel partners to meet or exceed their sales objectives, we have historically received a substantial portion of purchase orders and generated a substantial portion of revenue during the last few weeks of each quarter *We can recognize such revenue in the quarter received, however, only if all of the requirements of revenue recognition, especially shipment, are met by the end of the quarter.*

208.    The Second Quarter 2017 Form 10-Q reported total revenue for the second quarter 2017 of $53.7 million.

209.    Revenue changes were attributed to the following:

During the second quarter of 2017, $28.6 million, or 53% of total revenue, was generated from the United States, which represents a 9% decrease as compared to the same period of 2016. During the first half of 2017, $59.3 million, or 52% of total revenue, was generated from the United States, which represents a 3% decrease as compared to the same period of 2016. The decrease was primarily due to lower products revenue, partially offset by higher services revenue attributable to the increase in PCS sales in connection with our increased installed customer base.

During the second quarter of 2017, $8.4 million, or 16% of total revenue, was generated from Japan, which represents a 23% decrease as compared to the same period of 2016. During the first half of 2017, $21.5 million, or 19% of total revenue, was generated from Japan, which represents a 2% decrease as compared to the same period of 2016. The decrease was primarily due to lower products revenue, partially offset by higher services revenue from PCS sales in connection with our increased installed customer base.

During the second quarter of 2017, $8.7 million, or 16% of total revenue, was generated from Asia Pacific regions excluding Japan, which represents a 12% increase as compared to the same period of 2016. During the first half of 2017, $18.9 million, or 17% of total revenue, was generated from Asia Pacific regions excluding Japan, which represents a 31% increase as compared to the same period of 2016. The increase was primarily due to higher products revenue and to a

lesser degree higher services revenue from PCS sales in connection with our increased installed customer base.

During the second quarter of 2017, $6.8 million, or 13% of total revenue, was generated from EMEA, which represents a 16% increase as compared to the same period of 2016. During the first half of 2017, $12.0 million, or 10% of total revenue, was generated from EMEA, which represents a 10% increase as compared to the same period of 2016. The increase was primarily due to higher products revenue and higher services revenue from PCS sales in connection with our increased installed customer base.

210.    The Second Quarter 2017 Form 10-Q falsely represented that A10 "prepared the accompanying unaudited condensed consolidated financial statements pursuant to the rules and regulations of the" SEC and that the "condensed consolidated financial statements are prepared in accordance with U.S. GAAP." The Second Quarter 2017 Form 10-Q also claimed that A10 maintained adequate internal controls over the Company's financial reporting, stating in relevant part:

***Evaluation of Disclosure Controls and Procedures***

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as required by Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended, or the Exchange Act, as of June 30, 2017.

* * *

Based upon our management's evaluation of our disclosure controls and procedures as of June 30, 2017, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

***Changes in Internal Control over Financial Reporting***

There were no changes in our internal control over financial reporting during the quarter ended June 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

211.   The Second Quarter 2017 Form 10-Q also contained certifications signed by Defendants Chen and Constantino, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, identical to, or substantially similar to, those in the 2015 Annual Report stated above in ¶125, representing that financial statements did not contain any material misrepresentations or omissions and that disclosure controls and procedures were adequate.

212.   Certifications pursuant to 18 U.S.C. § 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, identical to, or substantially similar to, those in the 2015 Annual Report stated above in ¶126, signed by Defendants Chen and Constantino, were also included with the Second Quarter 2017 Form 10-Q.

213.   The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial results, which were known to Defendants or recklessly disregarded by them.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) misstated revenue; (ii) violated A10's stated revenue recognition policies; (iii) lacked effective internal controls; and (iv) as a result of (i) – (iii), A10's financial statements were not in compliance with GAAP.

### D.   False and Misleading Statements in the September 28, 2017 Preliminary Third Quarter Earnings Press Release

214.   On September 28, 2017, A10 issued a press release announcing preliminary third quarter 2017 financial results, stating in relevant part:

> SAN JOSE, Calif., Sept. 28, 2017 – A10 Networks, Inc. (NYSE: ATEN), a Secure Application Services™ company, today announced that it expects revenue for its third quarter 2017 to exceed management's prior outlook provided on July 27, 2017. A10 Networks currently expects revenue to be between $59 million and $60 million, above its prior guidance of $53 million to $57 million. The company also expects to report a profit on a non-GAAP basis.

> The company also announced the departure of Ray Smets, EVP of worldwide sales, effective in the fourth quarter.   The company has initiated a search for a new worldwide sales leader, and during the interim, Tom Constantino, CFO of A10 Networks, will assume responsibility of the sales organization.

> "We expect to deliver a strong third quarter, led by sales into our marquee service provider customers.   We look forward to discussing our full results on our

conference call in October," said Lee Chen, president and chief executive officer of A10 Networks.  "Ray has been a key contributor to A10, including building a strong sales team.  We thank Ray for his service and wish him all the best in his future endeavors.  We have considerable talent within A10 and are confident in our ability to manage a smooth transition."

215.    The above statements continued to be materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, financial results and prospects, which were known to Defendants or recklessly disregarded by them.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) understated revenue due to improper revenue recognition practices; (ii) violated A10's stated revenue recognition policies; and, (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

### E.    False and Misleading Statements in the October 26, 2017 Third Quarter 2017 Earnings Press Release and Conference Call

216.    On October 26, 2017, A10 issued a press release announcing its final third quarter 2017 financial results (the "October 26, 2017 Press Release"), stating in relevant part:

**Third Quarter 2017 Financial Summary**

- Revenue of $61.4 million, compared with $55.1 million in third quarter 2016

- GAAP net loss of $2.7 million, or $0.03 per basic share

- Non-GAAP net income of $2.1 million, or $0.04 per diluted share

A reconciliation between GAAP and non-GAAP information is contained in the financial statements below.

"We delivered a strong third quarter and are pleased with the team's execution. Revenue exceeded our initial and revised guidance and increased 12% year-over-year to reach $61.4 million. Our top-line performance was driven by solid demand and the team's improved execution as we began to see the initial progress from some of the recent changes we implemented in the quarter," said Lee Chen, president and chief executive officer of A10 Networks. "We are making solid progress, but still have a lot of work ahead of us in order to continue to capitalize on the fast-growing areas of our market. The share repurchase authorization announced today reflects our confidence in our market opportunities and our commitment to enhancing shareholder value."

217.   On the same day, Defendants held an earnings conference to discuss the Company's final third quarter 2017 financial results.   Defendants Chen and Constantino repeated the same false and misleading revenue numbers for the Q3'17 as reported in the October 26, 2017 Press Release.

218.   Defendant Constantino followed up on A10's second quarter 2017 proposed accountability improvements, stating in relevant part:

> Overall, we delivered a strong third quarter and we are pleased with the initial progress we are seeing from the actions we took to improve execution. More specifically, we improved our forecasting processes and sales performance analytics which led to improved sales execution.
>
> We also improved our focus on accountability and performance management. Similarly, we have taken steps to improve our cross-functional collaboration in support of sales in delivering the quarter. While we have more work to do, as mentioned by Lee, we believe we are on the right track and that our efforts helped us deliver a strong finish to the quarter.

219.   Analysts questioned the quick turn-around from the previous disappointing quarters:

> **<Q - Tal Liani>:** So, sorry, I'm taking too much time, but I have one last question. If I look back a few quarters, there were some disappointment and now you're starting to show solid momentum. What changed? What drove – was it really just sales execution or timing of projects? I'm trying to understand how much of today's momentum or strength is a reflection of something you fixed in the business, maybe go-to-market or anything and how much of it is products and the offerings and what changed now versus before?
>
> **<A - Lee Chen>:** It's really a combination of both.  Why this is due to the fact we have a lot of the marquee customer in service provider, their business can be lumpy from quarter-to-quarter.  ***But if we look at annually, we still – I think we are in the good trajectory, but on a quarter-to-quarter basis, it's the timing of the project. The second is really [indiscernible] (30:20) sales execution.  I think we improved our sales execution last quarter.***  We still have a lot of work to do and we are working diligently to improve our go-to-market sales enablement and also sales execution and also alignment among sales, marketing and engineering. We are working on all of that. We still have a long way to go.

220.   The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, financial results and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements

and/or failed to disclose that they had admittedly: (i) understated revenue due to improper revenue recognition practices; (ii) violated A10's stated revenue recognition policies; and, (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**F.      False and Misleading Statements in the Third Quarter 2017 Form 10-Q**

221.    On November 2, 2017, the Company filed its quarterly report on Form 10-Q for the quarter ended September 30, 2017 (the "Third Quarter 2017 Form 10-Q") with the SEC, which was signed and certified by Defendants Chen and Constantino.

222.    The Third Quarter 2017 Form 10-Q included false and misleading statements regarding A10's revenue recognition practices as follows:

> Our products revenue primarily consists of revenue from sales of our hardware appliances upon which our software is installed. Such software includes our ACOS software platform plus one of our ADC, CGN, TPS, SSLi or CFW solutions. Purchase of a hardware appliance includes a perpetual license to the included software. *We recognize products revenue at the time of shipment, provided that all other revenue recognition criteria have been met.* As a percentage of revenue, our products revenue may vary from quarter to quarter based on, among other things, the timing of orders and delivery of products, cyclicality and seasonality, changes in currency exchange rates and the impact of significant transactions with unique terms and conditions.

> * * *

> As a result of end-customer buying patterns and the efforts of our sales force and distribution channel partners to meet or exceed their sales objectives, we have historically received a substantial portion of purchase orders and generated a substantial portion of revenue during the last few weeks of each quarter *We can recognize such revenue in the quarter received, however, only if all of the requirements of revenue recognition, especially shipment, are met by the end of the quarter.*

223.    The Third Quarter 2017 Form 10-Q reported total revenue for the third quarter 2017 of $61.4 million.

224.    The Third Quarter 2017 Form 10-Q attributed revenue increases and decreases to the following:

> During the third quarter of 2017, $28.8 million, or 47% of total revenue, was generated from the United States, which represents a 19% increase as compared to the same period of 2016. The increase is primarily due to higher products revenue. During the first nine months of 2017, $88.1 million, or 50% of total revenue, was

generated from the United States, which represents a 3% increase as compared to the same period of 2016. The increase is primarily due to higher services revenue attributable to the increase in PCS sales in connection with our increased installed customer base.

During the third quarter of 2017, $16.6 million, or 27% of total revenue, was generated from Japan, which represents a 4% increase as compared to the same period of 2016. The increase is primarily due to higher services revenue from PCS sales in connection with our increased installed customer base. During the first nine months of 2017, $38.1 million, or 22% of total revenue, was generated from Japan, which represents a 1% increase as compared to the same period of 2016. The increase is primarily due to higher services revenue from PCS sales in connection with our increased installed customer base, partially offset by lower products revenue.

During the third quarter of 2017, $6.7 million, or 11% of total revenue, was generated from Asia Pacific regions excluding Japan, which represents a 10% decrease as compared to the same period of 2016. The decrease is primarily due to lower products revenue, partially offset by higher services revenue from PCS sales in connection with our increased installed customer base. During the first nine months of 2017, $25.6 million, or 15% of total revenue, was generated from Asia Pacific regions excluding Japan, which represents a 17% increase as compared to the same period of 2016. The increase was primarily due to higher products revenue and to a lesser degree higher services revenue from PCS sales in connection with our increased installed customer base.

During the third quarter of 2017, $6.1 million, or 10% of total revenue, was generated from EMEA, which represents a 1% increase as compared to the same period of 2016. The increase is primarily due to higher services revenue from PCS sales in connection with our increased installed customer base, partially offset by lower products revenue. During the first nine months of 2017, $18.1 million, or 10% of total revenue, was generated from EMEA, which represents a 7% increase as compared to the same period of 2016. The increase was primarily due to higher services revenue from PCS sales in connection with our increased installed customer base.

225.    The Third Quarter 2017 Form 10-Q falsely represented that A10 "prepared the accompanying unaudited condensed consolidated financial statements pursuant to the rules and regulations of the [SEC]" and that the "condensed consolidated financial statements are prepared in accordance with U.S. GAAP."  The Third Quarter 2017 Form 10-Q also claimed that Defendants maintained adequate internal controls over the Company's financial reporting, stating in relevant part:

*Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as required by Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended, or the Exchange Act, as of September 30, 2017.

\* \* \*

Based upon our management's evaluation of our disclosure controls and procedures as of September 30, 2017, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

*Changes in Internal Control over Financial Reporting*

There were no changes in our internal control over financial reporting during the quarter ended September 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

226. The Third Quarter 2017 Form 10-Q also contained certifications signed by Defendants Chen and Constantino, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, identical to, or substantially similar to, those in the 2015 Annual Report stated above in ¶125, representing that financial statements did not contain any material misrepresentations or omissions and that disclosure controls and procedures were adequate.

227. Certifications pursuant to 18 U.S.C. § 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, identical to, or substantially similar to, those in the 2015 Annual Report stated above in ¶126, signed by Defendants Chen and Constantino, were also included with the Third Quarter 2017 Form 10-Q.

228. The above statements were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or

1    failed to disclose that they had admittedly: (i) misstated revenue; (ii) violated A10's stated revenue

2    recognition policies; (iii) lacked effective internal controls; and (iv) as a result of (i) – (iii), A10's

3    financial statements were not in compliance with GAAP.

4         **G.**      **False and Misleading Statements in the January 16, 2018 Preliminary Fourth Quarter and Year-End 2017 Earnings Press Release**

5

6         229.     On January 16, 2018, A10 issued a press release announcing the Company's

7    preliminary fourth quarter 2017 financial results.  This press release revealed that the Company

8    expected revenue for Q4'17 under its previously issued guidance, stating in relevant part:

9            SAN JOSE, Calif., Jan. 16, 2018 - A10 Networks, Inc. (NYSE: ATEN), a Secure
     Application Services™ company, today announced preliminary results for the

10           fourth quarter ended Dec. 31, 2017.

11           ***A10 Networks expects total revenue in the fourth quarter 2017 to be between
     $55.5 million and $56.0 million, below its prior guidance of $64.0 million to***

12           ***$67.0 million.***  The company expects to report GAAP net income in the range of
     break-even to $0.01 per share.  On a non-GAAP basis, the company expects to

13           report net income between $0.05 and $0.06 per share, using approximately 74.6
     million diluted shares, which is within the previous guidance for non-GAAP net

14           income of $0.01 to $0.07 per share, using approximately 74.0 million shares on a
     diluted basis. GAAP and non-GAAP net income results include a benefit from

15           performance-based variable compensation.  A preliminary reconciliation between
     GAAP and non-GAAP information is contained in the financial statements below.

16

17           ***"We are disappointed with our revenue results for the quarter, which were
     below our guidance primarily due to a shortfall in North America sales as we***

18           ***experienced lower than expected seasonal demand trends in the region.*** Despite
     this shortfall, we increased our cash and cash equivalents by $6.6 million, and

19           continued to see strength for our security solutions," said Lee Chen, president and
     chief executive officer of A10 Networks.  "Over the past two quarters, we have

20           implemented a number of changes across the organization to help improve our
     execution and expand our presence in security to drive growth.  We are making

21           progress on these initiatives and continuing to work to align our sales and
     enablement engine with the growth opportunities in our market.  As part of these

22           initiatives, we have brought in Chris White to lead our global sales team, effective
     January 2, 2018. Chris is an accomplished sales executive with a long career in

23           the cybersecurity industry, and his expertise in sales and channel leadership will
     be a solid asset to A10."

24

25        230.     On this news, A10's share price plummeted by $0.99 per share, or over 13%, from

26   its previous closing price of $7.31 on January 16, 2018 to close at $6.32 per share on January 17,

27   2018 on unusually heavy trading volume of over 2.9 million shares, causing damage to investors.

28

As set forth herein, artificial inflation in A10's stock price was removed when concealed risks materialized and/or the truth about the material misrepresentations and omissions was partially revealed to the public on January 16, 2018. *See* Section VIII.B, *infra*.

231.    The above statements continued to be materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, financial results and prospects, which were known to Defendants or recklessly disregarded by them.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that they had admittedly: (i) misstated revenue due to improper revenue recognition practices; (ii) violated A10's stated revenue recognition policies; and, (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

## VII.    THE TRUTH IS REVEALED

232.    On January 30, 2018, the Company issued a press release announcing the postponement of the Q4'17 and FY'17 financial results and revealing that A10's Audit Committee was investigating the Company's revenue recognition practices for the fourth quarter of 2015 through the fourth quarter of 2017, stating in relevant part:

> In the fourth quarter of 2017, the Company determined that a mid-level employee within its finance department had violated the Company's Insider Trading Policy and Code of Conduct.  As a result, the Company, with the assistance of outside counsel, conducted an email review and additional procedures to ensure the accuracy of its reporting of financial information for 2017.  Such review and procedures did not identify matters that required material adjustments to be made. ***Nonetheless, the Company's Audit Committee determined that further review and procedures relating to certain accounting and internal control matters should be undertaken.  The Audit Committee's investigation, which is being conducted with the assistance of outside counsel, is principally focused on certain revenue recognition matters from the fourth quarter of 2015 through the fourth quarter of 2017 inclusive.***

> The investigation is in its early stages.  The Company is not able to provide a date as to when it will be completed, nor provide any assurance that the Company will not determine that material adjustments to its past financial statements are appropriate.

> At the conclusion of the Audit Committee's investigation, the Company will announce the scheduling of a conference call to discuss full financial results for the 2017 fourth quarter and full year.

233.   Upon this news, the price of A10 stock declined over 12% from a closing share price of $6.99 on January 30, 2018 to $6.13 at close on January 31, 2018, on heavy trading volume of over 1.4 million shares, thereby damaging investors.

234.   On March 16, 2018, A10 announced that the Company's FY'17 Form 10-K filing would officially be delayed.  Specifically, the Company indicated that it would not expect to file the Form 10-K within the 15 day extension period and that it was presently uncertain as to when the Company would be able to file a Form 10-K or Form 10-Q in the foreseeable future.

235.   On March 23, 2018, Dougherty & Company report issued a report titled, "Throwing in the Towel, with 10-K Delayed the Future Remains Uncertain; Downgrading to Neutral," which discussed how A10's disappointing financial and operational results, in addition to future uncertainty, prompted a rating downgrade and a price target suspension.  The report specifically noted, "A10 is fresh off a major revenue miss and has not been able to formally address investor concerns. The company will not be able to release a 10-K until the investigation is concluded, which presents significant uncertainty for at least one more quarter."  This report also went on to criticize the Company's recent sales performance, commenting specifically on sales execution and poor communication with the reseller community:

> ***The company has taken the right steps to bring in a new head of sales while realigning and focusing the sales organization.***  We expect it may take a quarter or two for the new sales team to develop a broader base of customers.  ***Additionally, conversations over the past year with the reseller community suggest the company has a history of being inconsistent (changes in personnel) which has provided a window of opportunity for competitors to slide in, develop relationships, and take advantage of opportunities in different regions.***  We view some of the on-again, off-again communication can be attributed to not having a robust security portfolio.

236.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of A10's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## VIII.   LOSS CAUSATION

237.   As detailed herein, during the Class Period, Defendants engaged in a scheme to deceive the market by taking a course of action that artificially inflated the price of A10 common stock and operated as a fraud or deceit on Class Period purchasers of A10 common stock by failing

1   to disclose and misrepresenting the adverse facts detailed herein.   When Defendants' prior

2   misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the

3   price of A10 common stock declined significantly as the prior artificial inflation came out of the

4   Company's stock price.

5        238.   As a result of their purchases of A10 common stock during the Class Period,

6   Plaintiffs and the Class suffered damages under the federal securities laws.   Defendants' omissions

7   and false and misleading statements had the intended effect and caused A10 common stock to trade

8   at artificially inflated levels throughout the Class Period, trading as high as $10.77 per share on

9   October 3, 2016.

10        **A.**     **The July 13, 2017 Partial Disclosure**

11        239.   Artificial inflation in A10's stock price was removed when concealed risks

12   materialized and/or the truth about the material misrepresentations and omissions was partially

13   revealed to the public on July 13, 2017.  Following the close of trading, the Company issued a

14   press release regarding the Company's preliminary revenue for the second quarter of 2017.

15   Specifically, A10 disclosed that revenue for the second quarter 2017 would be between $52.5 and

16   $53.5 million, more than 15% below the Company's prior guidance of $62.0 and $64.0 million.

17   The disclosures made on this day revealed on a piecemeal basis the true nature and extent of the

18   Company's improper recognition of revenue, sales execution issues, and accounting practices.

19        240.   As discussed above, these disclosures reduced the amount of inflation in the price of

20   A10's publicly traded securities, causing economic injury to Additional Plaintiff Kraszewski and

21   other members of the Class.  *See* Section VI.A, *supra*.  Specifically, following this disclosure, on

22   the next trading day, the price of A10 shares declined by $1.32, or approximately 16%, on

23   significant trading volume of 5,334,043 shares, or approximately 11 times the average daily trading

24   volume during the Class Period.

25        241.   The July 13, 2017 disclosure was not sufficient on its own to fully remove the

26   inflation from A10's stock price because each of them only partially revealed the conditions, risks,

27   and trends that had been concealed from investors.  The corrective impact of the disclosures

28   alleged herein was tempered by Defendants' continued misstatements and omissions about A10's

improper recognition of revenue, sales execution issues, and accounting practices.   These misrepresentations and omissions inflated and maintained the prices of A10's publicly traded stock at levels that were artificially inflated, inducing Class members to continue purchasing A10 stock even after the truth began to partially enter the market.

**B.     The January 16, 2018 Partial Disclosure**

242.    Artificial inflation in A10's stock price was removed when concealed risks materialized and/or the truth about the material misrepresentations and omissions was partially revealed to the public on January 16, 2018.  Following the close of trading, the Company issued a press release regarding the Company's preliminary revenue for the Q4'17.   Specifically, A10 disclosed that revenue for Q4'17 would be between $55.5 million and $56.0 million, or more than 13% below its prior guidance of $64.0 million to $67.0 million.   The disclosures made on this day revealed on a piecemeal basis the true nature and extent of the Company's improper recognition of revenue, sales execution issues, and accounting practices

243.    As more particularly described above (*see* Section VI.G, *supra*), these disclosures reduced the amount of inflation in the price of A10's publicly traded securities, causing economic injury to Plaintiffs and other members of the Class.  Specifically, following this disclosure, on the next trading day, the price of A10 shares declined by $0.99, or approximately 13.5%, on significant trading volume of 2,911,722 shares, or approximately 6 times the average daily trading volume during the Class Period.

244.    The January 16, 2018 disclosure was not sufficient on its own to fully remove the inflation from A10's stock price because each of them only partially revealed the conditions, risks and trends that had been concealed from investors.   The corrective impact of the disclosures alleged herein was tempered by Defendants' continued misstatements and omissions about A10's improper recognition of revenue, sales execution issues, and accounting practices.   These misrepresentations and omissions inflated and maintained the prices of A10's publicly traded stock at levels that were artificially inflated, inducing members of the Class to continue purchasing A10 stock even after the truth began to partially enter the market.

C.     **The January 30, 2018 Corrective Disclosure**

245.     The truth was fully revealed on January 30, 2018, when, as alleged above, the Company issued a press release following the market close announcing the postponement of the fourth quarter 2017 and full year earnings release and conference call.  As discussed above (*see* Section VII, *supra*), the Company's Audit Committee determined that further review and procedures relating to certain accounting and internal control matters should be undertaken prior to the release of the Q4'17 and FY'17 financial results.  The Company also announced that the investigation was principally focused on certain revenue recognition matters from the Q4'15 through the Q4'17, inclusive.

246.     Following this disclosure, the price of A10 shares fell from $6.99 at the close of trading on January 30, 2018 to $6.13 at the close of trading on January 31, 2018.  This decline of $0.86, or approximately 12%, occurred on significant trading volume of 1,444,787 shares, or approximately 6 times the average daily trading volume during the Class Period.  In the days that followed, A10's stock continued to decline, sinking to $5.77 by February 5, 2018.  The market's negative reaction to A10's January 30, 2018 revelations is demonstrated by the following chart:



247.   The timing and magnitude of A10's stock price decline from January 30, 2018 through January 31, 2018 negates any inference that the losses suffered by Plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct.  This point is evidenced by the chart below, which demonstrates the clear divergence of daily returns between A10 stock and the Russell 2000 Index, an index reflective of broader market trends, as the revelation of the truth became known to the market:



248.   By concealing the adverse facts detailed above, Defendants presented a misleading picture of A10's business and future financial prospects.  When the truth about the Company was revealed to the market, the price of A10 common stock fell significantly.  The declines in the price of A10 common stock detailed herein removed the inflation therefrom, causing real economic loss to investors who purchased A10 common stock during the Class Period.

249.   In addition, as described above, analysts and investors directly attributed this price decline to A10's announcement that the Company would have to adjust and/or restate its financial statements for the periods between the Q4'15 through the Q4'17.  *See* Section VII, *supra*.

250.    The declines in the price of A10 common stock following the corrective disclosures were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to the market.  The timing and magnitude of the price declines in A10 common stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

251.    The damages suffered by Plaintiffs and the Class are a direct result of Defendants' fraudulent scheme to artificially inflate the price of A10 common stock, and the subsequent significant declines in the value of A10 common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX.    ADDITIONAL FACTUAL ALLEGATIONS FURTHER SUPPORTING SCIENTER

252.    Defendants acted with scienter by virtue of their (i) awareness of improper recognition of revenue practices, (ii) awareness of sales execution issues, (iii) departure from established accounting practices relating to internal controls over financial reporting, and/or (iv) their ultimate responsibility to ensure the accuracy of such statements and their reckless failure to do so.

253.    Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiffs and the Class.  Defendants knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.  Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's stock and would cause the price of A10 shares to be artificially inflated.   An inference of scienter is further supported by the following considerations.

### A.    The Individual Defendants' Hands-On Involvement in A10's "Core Operations" During the Class Period

254.    The improper business practices at issue in this case were all part of the Company's core operations, such as sales forecasts, inventory management, and customer and distributor

relationships.   Consequently, Defendants' scienter concerning such core operations may be reasonably inferred based on the preceding allegations in addition to the following considerations.

### 1.   A10 Senior Executives were Hands-On Throughout the Class Period

255.   During the Class Period, A10 was a relatively small company.  As disclosed in the Company's 2016 Form 10-K, "A10 had 837 full-time employees, including 410 engaged in research and development and customer support, 348 in sales and marketing, and 79 in general and administrative and other activities."

256.   Because the Individual Defendants were the CEO, CFOs, and EVP of Worldwide Sales of A10 during the Class Period, they had day-to-day operational control over and thorough knowledge of these core operations.  Indeed, Chen, Straughn, Natarajan, Constantino, and Smets demonstrated an acute hands-on approach to customer relations and sales in connection with SEC filings, investor calls, and presentations.

257.   The Company consistently portrayed Chen as a hands-on CEO who took an active role in the sales and financial reporting processes.  For example, in the 2015 Form 10-K filed with the SEC on March 1, 2016, A10 described Chen as the "chief operating decision maker" and described his detailed oversight of financial reporting:

> **Segment Information**
>
> Operating segments are components of an enterprise for which separate financial information is available and is evaluated regularly by our chief operating decision maker in deciding how to allocate resources and assessing performance. ***Our chief operating decision maker is our Chief Executive Officer.***
>
> ***Our Chief Executive Officer who reviews financial information presented on a consolidated basis, accompanied by disaggregated information about revenue by geographic region for purposes of allocating resources and evaluating financial performance.*** Accordingly, we have a single reportable segment and operating segment structure

258.   Chen also consistently touted his insight into A10's customer base and the attribution of the Company's revenue to specific customers during each quarter.  Chen's participation in the Q4'15 and FY'15 Earnings Call is representative.  As discussed above (*see*

Section IV.C.1, *supra*), A10 restated its financial statements for the Q4'15.  During the earnings call, Chen observed:

> ***I would like to highlight a few recent customer win examples:***  A global cloud hosting provider that has been an A10 ADC customer for over five years chose our TPS solution with our aGalaxy management system to help secure their infrastructure and sell DDoS as a service to their global customers.
>
> A large U.S. service provider customer expanded their Thunder TPS deployment in three additional data centers to help ward off volumetric DDoS attacks on their public cloud.  A leading Japanese service provider placed follow-on orders for our Thunder TPS solution that were more than double their initial early-2015 deployment.
>
> *   *   *
>
> Furthermore, we have a strong brand and relationships with the very companies that are investing in and building public and private cloud infrastructures, as well as software as a service and Web 2.0 providers.  In fact, 19 of our 20 top booking customers in 2015 were in one of these categories.
>
> Furthermore, half of the companies in the leaders and visionary section of Gartner's 2015 Cloud Infrastructure as a Service magic quadrant are A10 customers.

259.    Beyond restricting comments to prepared remarks, during earnings calls, Chen provided analysts with detailed descriptions of quarterly customer activity in response to questions. The following exchange is representative:

> <Q - Brent Bracelin>: Thanks here. Greg, maybe a couple questions if I could on the return to 20% growth here.  Bright spot in the U.S. looks like it was – a bright spot this quarter looks like it was the U.S. up over 50%.  Walk us through the drivers there.  It sounds like you did have a large U.S., I believe, service provider customer in the quarter that helped drive that growth, question one.
>
> And then question two, as you think about the guide up here looking for another quarter of north of 20% growth, what's giving you the confidence?  Is it the continuation of trends in the U.S.?  Are you seeing international bookings strengthen?  Any color on what's given you confidence in sustaining 20%- plus growth here in Q1 would be helpful as well.
>
> <A - Lee Chen>: ***Brett, this is Lee. Let me answer the questions first, maybe Greg can add some color to it. I think we are, even without the single largest 19% revenue customer, it would still be a record booking for Q4.***
>
> So we believe we are very well positioned in the area where our customer are investing – a pubic cloud, private cloud, Web 2.0, and software as a service, and we created a high-end market where functionality and performance are important for customers.
>
> I think the service provider is our sweet spot.  The power ACOS platform position A10 well for the SP market.  ***And we enter the Q1 with very strong backlog and we use the same methodology – we look at the pipeline, applying the same***

*methodology come up with a Q1 forecast and we are very comfortable with our Q1 forecast. Greg?*

260.    In addition to commenting on prior performance, Chen provided detailed responses concerning future guidance, and notably how customer orders would impact performance going forward.  Consider the following exchange from the October 26, 2017 Earnings Call:

<A - James E. Faucette>: Okay, great. And then, in your guidance, what are your expectations for large deals there?  Just wondering how you try to net those out as you're formulating your guidance and what the opportunity for even more upside might be, if some of the lumpy deals come through, how do you incorporate that into your guidance formulation.  Thanks.

<A - Lee Chen>: Shall I go first?

<A - Tom Constantino>: Sure.

<A - Lee Chen>: ***Yeah. So, our guidance will really be based on historical trend, based on pipeline, based on the backlog and based on the customer engagement we have.***  So, it really did not particularly count a lot of large deal coming in.  ***So, if we had the several large deal I expect to come in, they can potentially provide upside, but we are not counting on that.***

261.    Like Chen, Straughn, in his capacity as A10's CFO, consistently discussed the Company's sales and financial performance during earnings calls and investment presentations.  In a February 10, 2017 research report issued after Straughn's departure was announced, Dougherty & Company explained how Straughn was through-line to A10's evolution as a public company, "Mr. Straughn was instrumental in taking the company public and has been a key spokesperson to the investor community for the firm over the past six years."

262.    In connection with his role as a "spokesperson" on earnings call, Straughn demonstrated an intimate familiarity with specific customer orders and how individual transactions would impact whether or not A10 would meet earnings expectations.  Consider the following example from the Q3'16 earnings call:

**<Q - Alex Kurtz>:** Okay, and that didn't change sequentially it sounds like. Just back to these two transactions in the U.S., I just want to clarify, both of them were in the service provider or one was in service provider, one was in enterprise?

**<A - Greg Straughn>:** You say the two transactions, are you talking about the ones that we said were – that did not ship?

**<Q - Alex Kurtz>:** Yes.

**<A - Greg Straughn>:** Yes. So those were both in – no, those were actually, there is one of each in that environment. ***And so just to clarify, these were deals that came in and what we saw was that in the quarter just ended, we saw a backlog that was larger than we had anticipated in the quarter and larger than what we had seen coming out of Q3 last year. And interestingly, the addition to backlog, if it had shipped and shippable as we would have expected, that would have put us into the lower end of our range for the quarter.***

263.    During earnings calls, Straughn demonstrated a facility with describing how specific transactions recognized during a quarter impacted the Company's overall performance.    In addition, Straughn demonstrated an ability and willingness to provide guidance on the Company's future performance.  The following excerpts from the Fourth Quarter and Year-End 2015 Earnings Call are representative:

<Q - Ittai Kidron>: Thanks. Hi, guys and congrats on a good quarter.  I wanted to dig in into this large customer and kind of get your perspective on whether the upside in the quarter came from that customer or it came from others.  I'm just trying to get a better understanding of how much visibility you had into that customer and how much you will spend into December.

And also what are your working assumptions with regards to that customer or any other 10% customer in March?  Is there a 10% customer expected?  What I'm hoping to avoid is a situation where there's a big gap to kind of fill in somewhere in the mid-year.

<A - Greg Straughn>: Thanks for the note there.  As it pertains to this particular customer, I want to call it a couple of things.  One is that it wasn't a 19% deal with the customer or they were 19% customer.  So the large deal did not represent that entire amount.

***Secondly is that as we went into our guidance, we had pretty good visibility on this transaction.  So there is really nothing about it that was a surprise.  So the upside as we move to the quarter, was primarily driven by what I mentioned earlier which was the consistent strong bookings across a lot of products and lot of regions.***

And so, it's kind of cumulative effect as opposed to this deal dropping in to the quarter.  And then when we look at whether this creates a hole in Q1, if you recall back in Q2, we had a large deal as well and there was concern that will create a hole in Q3, and it did not.

***And so, the same thing is true here with a strong backlog going into Q1, strong sales momentum, good confidence in the pipeline.  And so, we don't feel like we are stepping out[indiscernible] (31:26) ahead of ourselves on the Q1 guidance. We are confident that all elements that we have together in business will make that number a reality.***

* * *

    &lt;Q - Ashwin X. Kesireddy&gt;: Over how many quarters do you think you'll continue to recognize revenue from the deal?

&lt;A - Greg Straughn&gt;: Well, the product piece of it was all shipped and recognized within Q4.  ***And then the maintenances related to that will be recognized over a year.  So that particular deal has most of it in Q4 and it will have some services piece over the next, I think it's 12 month.***

264.    Similarly, during earnings calls, Constantino also demonstrated an ability to opine on the quarterly purchasing activity of existing customers and the Company's acquisition strategy.

&lt;Q - Mark Kelleher&gt;: Does the low-hanging fruit, [ph] let's call it, around (17:58) the service provider side take sales force attention away from the enterprise? Is there any of that going on?

&lt;A - Tom Constantino&gt;: I don't think that's the case. I mean, the large deals that we win on the service provider side and those are deals that have been in the works for a while.  ***They take a lot of continued focus by our teams, but that doesn't distract from others who are concentrating more on the enterprise side.  So, I don't think that's the case, Mark.***

\*\*\*

&lt;Q - Tal Liani&gt;: You do have also enterprise exposure.  How are the trends in the enterprise segment?

&lt;A - Tom Constantino&gt;: I think overall if you look at quarter-by-quarter, we acquire between 150 to 200 new enterprise customers.  ***And in this quarter, we also acquired several new logo.  One good thing we observe about our security offering is half of our security customers are new to A10.***

265.    In the event that the Company's CEOs and CFOs were unaware of the individual transactions from which revenue was improperly recognized, this ignorance constitutes acting in such a deliberately reckless manner as to constitute fraud and deceit upon Plaintiffs and other Class members.  However, the most reasonable inference from the materiality of the revenue recognition issues to A10's financial results during the Class Period is that the Individual Defendants were aware that the Company improperly recognized revenue when payment was contingent on resale and/or when transactions included extended payment terms beyond the Company's customary terms during the Class Period.

          **2.**      **A10 Deployed Software Solutions that Provided Real-Time Insight into Sales Execution and Financial Management**

266.    Sales enablement generally refers to process of providing the sales organization with the information, content, and tools that help sales people sell more effectively.  As described

by Salesforce, a leading sales and customer relations management ("CRM") software company, "[s]ales enablement software and sales enablement tools like Salesforce CRM are important but the way the system is rolled out and the way the company views their roles with the new system is paramount."[11]   A10's executive team implemented a variety of software solutions to ensure that sales and finance teams could capitalize on information in real time in order to improve operational and sales execution performance.  And at A10, the Company's senior most financial officers took a hands-on approach to driving sales enablement.

267.   In a July 31, 2017 Dougherty & Company analyst report, one of Constantino's initial goals as the new A10 CFO was to enact "improved sales enablement processes to improve operational efficiency" with the goal of "improv[ing] pipeline execution."  Moreover, during the Q2'17 earnings call, Constantino explained:

> Before we move to our outlook for the third quarter, I would like to discuss some of the initial actions we are taking to improve our execution and support growth for our expanding product line. *We are increasing our focus to improve our go-to-market efficiency and effectiveness, which includes evaluating our sales enablement engine to ensure we have dedicated the focus and resources necessary to penetrate deeper into our markets, including security.  We are also implementing a number of cross-functional actions to increase accountability and improve our performance analytics. In addition to helping improve our execution, we believe these actions will also help drive greater visibility.*

268.   The cross-functional actions that Constantino described flowed from data that was captured and presented to senior A10 executives on a real time basis.  Specifically, prior to and during the Class Period, A10 implemented enterprise software solutions that ensured that executives had access to real time information concerning the sales pipeline and forecasted revenue, as described in the following paragraphs.

269.   Prior to its initial public offering, A10 transitioned from QuickBooks to the Oracle E-Business Suite (EBS) Financials for enterprise resource planning, which also integrated into A10's SalesForce CRM solution.[12]  By integrating the Company's ERP and CRM systems, A10

---

[11] *See* "Sales Enablement is a Lifestyle: Strategies for Sales Enablement Solutions," Salesforce, https://www.salesforce.com/hub/sales/sales-enablement-software/ (last visited Oct. 4, 2018).

[12] *See* "CRM and ERP Integrated in the Cloud," Dell: Boomi, https://boomi.com/customer/crm-and-erp-integrated-in-the-cloud/ (last visited Oct. 5, 2018).

was able to ensure the seamless flow and integration of data between these two systems while controlling head count and operational costs.

270.     A10 also implemented other software solutions that leveraged data captured by its CRM and ERP systems.  For example, Eric Kwok, currently Senior Director Worldwide Support & Logistics, worked with a consulting firm to implement a cloud-based customer service solution that enabled the sales team "to view and manage expiring service contracts and gain full visibility into customer issues."[13]   Agents can remain within a single user interface, which allows them to communicate better and solve customer issues faster and more effectively."  Kwok noted that the software improved oversight over employees: "We can now motivate our teams with real time recognition and coach individuals to meet key metrics and desired behaviors."  And critically, "[c]omprehensive dashboards and reports provide management *real-time insights into support metrics from any device*. Departments are now able to configure their reports and dashboards without IT help.  *A10 Networks Managers are excited that they can quickly customize reports to improve and accelerate business decisions. They receive notifications when metrics reach specific thresholds*."[14]

271.     In addition, A10 recognized the need to leverage its available customer data to develop comprehensive performance assessments for its budgeting and planning.  Accordingly, the Company turned to Adaptive Insights, which "provided much needed insight into metrics, and the subsequent results—accelerated processes, detailed visual analytics, and nimble forecasting— brought about a more thorough approach to data management."[15]   Commenting on this software, Zoby Shaikh, A10 Director – Finance & Analytics, observed the with this solution, "*we're able to*

---

[13] *See* "Networking Leader Deploys Salesforce Service Cloud Globally," West Coast Consulting Group, https://westcoastconsulting.com/customers/a10-networks/ (last visited Oct. 5, 2018.

[14] *Id.*

[15] "Technology Leader Adopts the Adaptive Suite to Keep Pace With Growth - Data Integration and Automation Build Forecasting Accuracy at A10 Networks," Adaptive Insights, https://www.adaptiveinsights.com/anz/customer-stories/a10-networks (last visited Oct. 5, 2018).

1   *create much more accurate financial forecasts by employing real-time data analysis on key*

2   *business trends*, and then ascertain what those trends mean for our business."[16]

3       272.   Similarly, A10 turned to Impartner's Partner Relationship Management solution to

4   automate channel operations and to drive channel growth by expanding upon the off-the-shelf

5   SalesForce customer-relationship management software.  Specifically, Lisa Varnell, A10 channel

6   marketing programs manager, explained how the enhanced SalesForce solution enabled the

7   Company to grow its channel sales business:

> I have to say, Impartner makes my job easier.  It allows the channel team to focus
> on the right channel partner at the right time.  **To have a successful partner
> program for any partner organization, you need to be able to actively engage with
> your partners in real time, you need to know what your partners are doing, and
> you need to have insights into your partners' pipeline for your solutions.**  It is
> critical to your organization's success. . . . I work in our portal every day, but the
> data is integrated into Salesforce, so our channel and field sales organizations can
> view what the channel partners are submitting without having to learn a new
> interface.[17]

13       273.   Accordingly, A10 employed technical systems that provided management with real

14   time access to customers and sales reports that enabled them to make intra-quarter pivots to

15   account for trends in customer demand.  This information translated directly into the Company's

16   forecasts and financial performance.  By way of example, during the Q2'17 earnings call, Chen

17   explained how A10 was tracking "approximately a dozen sizable deals" that they thought would

18   "close in the quarter" and Smets went on to explain how he and others at A10 were actively

19   "tracking" those deals, in addition to the deals' unique characteristics and expected closing dates.

20       274.   Accordingly, the technical solutions described in the preceding paragraphs (¶¶269-

21   72) provided the cadre of A10 executives with the ability to dynamically track the Company's

22   customer and sales execution performance.

---

[16] *Id.*

[17] "A10 Network Extends its Salesforce CRM to the Channel with Impartner to Accelerate Indirect Revenue." PR Newswire, https://www.prnewswire.com/news-releases/a10-networks-extends-its-salesforce-crm-to-the-channel-with-impartner-to-accelerate-indirect-revenue-300363920.html (last visited Oct. 4, 2018.

B.      **Executive Turnover**

275.    Scienter is further supported by the frequent and abrupt executive departures throughout the Class Period.  During the Class Period, A10 cycled through three different CFOs and experienced the departure of two other members of A10's six person "Executive Officer" slate, as described in the Proxy Statements filed with the SEC during the Class Period.

276.    On February 9, 2017, the Company announced that Defendant Straughn decided to step down as CFO of the Company, effective upon the date of filing of the Company's Annual Report on Form 10-K for the year ended December 31, 2016.  During his tenure as CFO, Straughn served as a member of A10's Executive Officer team.  Pursuant to a formal transition agreement filed with the SEC, on February 23, 2017, Straughn voluntarily resigned as CFO from A10 but agreed to facilitate a "successful transition of the CFO role" through April 1, 2017.  No further explanation was provided for Straughn's resignation.

277.    Following Straughn's departure, Defendant Natarajan, who joined A10 in September 2015 as Vice President and Controller with global responsibility for global accounting operations, served as Interim CFO during the period between February 2017 until June 2017 and left A10 in November 2017.  During his abbreviated tenure as Interim CFO, Natarajan served as a member of A10's Executive Officer team.  Defendant Constantino subsequently joined A10 as CFO and an Executive Officer in June 2017.

278.    In addition to the finance organization, senior A10 executives involved in sales and marketing turned over during the Class Period.  For example, Sanjay Kapoor served as A10's Vice President of Global Marketing starting in March 2015.  In the Proxy filed with the SEC on April 24, 2015, Kapoor was listed as one of A10's six Executive Officers.  During the Q1'15 Earnings Call held on May 4, 2015, Chen noted that "Sanjay is well recognized for developing global marketing programs that help accelerate growth and increase brand awareness at some of the most well-known technology companies."  As noted in the Company's April 7, 2015 press release, Kapoor reported directly to Chen.  However, approximately one year later, Kapoor separated from A10 effective March 18, 2016 and received a severance package equivalent to nine-months salary

1    and the early vesting of 25% of restricted stock units.  No further explanation was provided for

2    Kapoor's separation from A10.

3          279.    Defendant Smets was another member of A10's Executive Team that departed prior

4    to the end of the Class Period.  Smets served as EVP of Worldwide Sales since November 2016

5    and as Vice President of Worldwide Sales from July 2013 to November 2016.  Pursuant to Smets'

6    offer letter filed with the SEC, Smets reported directly to Chen.  As A10's senior sales executive,

7    Smets participated in earnings calls and investor presentations throughout the Class Period, and

8    provided guidance regarding the Company's efforts to develop and retain customer relationships.

9    On September 28, 2017, the Company announced the departure of Smets; however, a formal

10   separation agreement filed with the SEC indicated that Smets' resignation was effective October

11   31, 2017.  Following Smets' departure, Constantino, A10's CFO, assumed responsibility of the

12   Company's sales organization on an interim basis.

13         280.    The Company signaled that Smets' departure did not stem from a material

14   disagreement with the Company regarding its operations, policies, or practices.  No further

15   explanation was provided for Smet's resignation.  However, in a January 16, 2018 research report,

16   Morgan Stanley "largely suspect[ed]" that the 3Q'17 earnings "miss may have been in part due to

17   [Smets'] departure" as opposed to A10's attribution of "lower than expected seasonal demand."

18   Morgan Stanley also noted that "ahead of the Q4 call" it planned to "seek further insight into the

19   degree to which execution issues from leadership transition affected the shortfall."

20         281.    Accordingly, during the approximate two year Class Period, A10's most senior

21   finance, marketing, and sales executives turned over.

22       **C.**    **Individual Defendants' Accounting Expertise**

23         282.    Scienter is further supported by the Individual Defendants' accounting experience

24   and expertise.

25         283.    Defendants repeatedly touted Defendant Chen's deep involvement in the financial

26   reporting process.  For example, in the 2015 Form 10-K, the Company described Chen's hands-on

27   involvement in the financial reporting process:

28

*Our Chief Executive Officer who reviews financial information presented on a consolidated basis, accompanied by disaggregated information about revenue by geographic region for purposes of allocating resources and evaluating financial performance.* Accordingly, we have a single reportable segment and operating segment structure

284.    Defendant Straughn, A10's CFO from the beginning of the Class Period until February 9, 2017, holds a B.S. in Finance from the University of California at Berkeley. Prior to joining A10 in 2011, Straughn had prior experience serving as a CFO, including at Kabira Technologies, Inc., a provider of high-performance software products to the telecommunications and financial services market.

285.    Defendant Natarajan, A10's Interim CFO from February 2017 until June 2017, is a Certified Public Accountant and holds a Bachelor of Science from the University of Calcutta. Prior to being appointed Interim CFO, he served as the Company's Vice President and Controller and was responsible for global accounting operations. Prior to joining A10 Networks in September 2015, Natarajan served as vice president, controller and chief accounting officer at Fluidigm Corporation. Subsequent to being employed as Senior Manager of Assurance and Advisory Business Services at Ernst & Young and prior to joining A10, Natarajan held senior corporate finance and accounting roles at other companies.

286.    Defendant Constantino, A10's CFO since June 2017, holds a B.S. in Business Administration from San Jose State University and began his career in public accounting at PricewaterhouseCoopers. Prior to joining A10, Constantino served as Vice President of Accounting and Finance Operations with Western Digital as well as CFO of its HGST subsidiary.

287.    The Individual Defendants' above-detailed higher education and degrees (respectively, in Accounting and Finance), and their extensive accounting and finance experience gained from serving as technology company CFOs and senior finance executives for decades, indicate that:

    a.     the Individual Defendants were long- and well-familiar with GAAP;

    b.     the Individual Defendants had a deep understanding of A10's significant accounting policies, including its stated revenue recognition policies; and hence

c.      the Individual Defendants' actual knowledge that recognition of such revenues contravened both GAAP and the Company's stated revenue recognition policies; or

d.      the Individual Defendants' reckless indifference to such facts.

**D.      A10 and Individual Defendants Failed to Maintain Effective Controls**

288.    Defendants failed to comply with their obligations imposed by the SEC to maintain books and records in sufficient detail to reflect the transactions of the Company and to prepare financial statements in accordance with GAAP.   Section 13(b)2 of the Exchange Act, entitled *Periodical and Other Reports*, states the following with respect to books and records and internal controls:

Every issuer which has a class of securities registered pursuant to (780(d)) and (781 on WL) section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:

A. make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

B. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that–

   i.   transactions are executed in accordance with management's general or specific authorization;

   ii.  transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

   iii. access to assets is permitted only in accordance with management's general or specific authorization; and

   iv.  the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences[.]

289.    A good system of internal controls helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations.   It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records.   This is made clear in SEC regulations and in a report prepared by the Committee of Sponsoring

Organizations of the Treadway Commission ("COSO"), Internal Control – Integrated Framework (the "COSO Report").[18]

290.    The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations.  More broadly, a system of internal control also includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

291.    Indeed, A10's management and advisors directly assessed the Company's internal control failings under the COSO framework, as described in the Restatement 10-K.

292.    The COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAP and regulatory requirements.  To prepare financial statements in conformity with GAAP, management's responsibility is acknowledged in a set of standards known as generally accepted auditing standards ("GAAS").  COSO Report, Executive Summary.  GAAS outlines the responsibilities of an auditor, but also explains that management is responsible for its own financial reporting:

> The financial statements are management's responsibility.  The auditor's responsibility is to express an opinion on the financial statements.  ***Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control*** that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management.  The auditor's knowledge of these matters and internal control is limited to that acquired through the audit.  Thus, ***the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility***.

AU § 110.03

---

[18] Generally accepted auditing standards codified in AU § 319, Consideration of Internal Control in a Financial Statement Audit, is based on the internal control framework described in the COSO Report. The COSO report was issued in September 1992 as a four-volume set.  Additional modifications and updates of the framework have been issued with the most recent Integrated Framework being issued in 2013 as a three-volume set.

293.    Borrowing from generally accepted auditing standards, the COSO Report defines fair presentation as the following:

- the accounting principles selected and applied have general acceptance;

- the accounting principles are appropriate in the circumstances;

- the financial statements are informative of matters that may affect their use, understanding and interpretation; and

- the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.[19]

294.    The COSO Report defines five components of an internal control framework that are needed to enable a business to achieve its objectives: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications, and (5) monitoring.

295.    A10's management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act.   The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

296.    The term "reliable" as used in the COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAS and regulatory requirements.  Reliability of financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

297.    Internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, is a process designed by, or under the supervision of, the CEO and CFO and is effected by the Board, management and other personnel to provide reasonable assurance

---

[19] See COSO Report, Chapter 3; see also Statement on Auditing Standards No. 69, The Meaning of "Present Fairly in Conformity With Generally Accepted Accounting Principles" in the Independent Auditor's Report (New York: AICPA, 1992).

regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with GAAP.  Internal control over financial reporting includes those policies and procedures that:

    a.     pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

    b.     provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAAP, and that the receipts and expenditures of the Company are being made only in accordance with appropriate authorization of management and the board of directors; and

    c.     provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

298.  Everyone in an organization has responsibility for internal controls.  However, the chief executive officer sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. "In any organization, 'the buck stops' with the chief executive.  He or she has ultimate ownership responsibility for the internal control system. . . .  The influence of the CEO on an entire organization cannot be overstated."  COSO Report, Chapter 8, p. 84.  The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business.

299.  The Addendum to the COSO Report makes it clear that the Company's chief financial officers – in this case, Defendants Straughn, Natarajan, and Constantino, were the principal accounting and financial officers during the Class Period – play a critical role with respect to the internal control system.

300.  Specifically, Defendants Straughn, Natarajan, and Constantino failed to comply with SEC regulations and the requirements of COSO.  As described herein, there was a material weakness in the internal controls at A10 that were necessary to prepare accurate financial statements and ensure compliance with regulatory filing requirements applicable to public companies.  A material weakness is defined by the SEC as "a deficiency, or a combination of

deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis[.]"  A10's internal control system failed to live up to the standards as set forth in the five elements of the internal control framework described above in ¶297.  Defendants failed to maintain an effective control environment that focused on achieving consistent application of accounting policies and procedures and strict adherence to GAAP, "because a material weakness in internal control over financial reporting related to ineffective controls within the Company's financial close process existed" during the Class Period.

301.    In each of A10's 2015 Form 10-K and 2016 Form 10-K, and intervening Form 10-Qs, A10, through Individual Defendants Chen, Straughn, Natarajan, and Constantino, stated that A10's controls over financial reporting were effective.  Furthermore, in each of A10's 2015 Form 10-K and 2016 Form 10-K, in addition to the  quarterly Forms 10-Qs for Q1'16 through Q3'17, A10, through Individual Defendants Chen, Straughn, Natarajan, and Constantino, certified that each of the following were disclosed:  (i) "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter . . . that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;" (ii) "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information;" and (iii) "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

302.    These statements were false and materially misleading when made, as admitted by A10 in issuing its Restatement.

303.    In particular, Defendants omitted to disclose that the Company "did not maintain an effective control environment" and that "[t]he control environment material weaknesses contributed to the revenue recognition material weaknesses."  Specific revenue recognition issues identified during the internal investigation included the following:

- Certain personnel in our credit and accounting functions did not have the adequate expertise to design and operate certain internal controls, to formalize certain appropriate policies and procedures, or to communicate matters relevant to revenue recognition.  ***Certain personnel in our sales and sales operations functions did not have the adequate expertise to identify and communicate to accounting personnel certain information relevant to revenue recognition.***

- ***Certain policies and procedures were not sufficiently detailed to establish expectations for and to support effective design and operation of internal controls in our sales, credit, and accounting functions to consistently determine whether our reseller's or distributor's price was fixed or determinable, or that collectability was reasonably assured in every case, and that once determined, adequate documentation was maintained.***

304.   A direct result of these internal control deficiencies was that A10's revenue recognition policies were flouted in a manner that allowed the Company to management earnings. Specifically, improperly recognized revenue meant the difference between meeting and falling below market expectations in the Q4'15, Q3'16, and Q4'16.

305.   In addition, as a result of the material internal control weaknesses described above, Defendants failed to comply with SEC regulations and the requirements of COSO.  The Company failed to "ensur[e] that a proper, consistent tone is communicated throughout the organization," and "to ensure strict compliance with [GAAP]" "through the implementation of process and controls."

306.   As part of the Restatement, A10 committed to implementing a series of remediation measures to address the material weaknesses identified during the protracted internal investigation relating to the Class Period breakdown of internal controls: the specific remediation measures that A10 indicated it would adapt include the following:

**Remediation Actions Relating to Material Weaknesses in Internal Control over Financial Reporting**

At the conclusion of its investigation, the Audit Committee recommended to management a number of remediation actions.  ***With the oversight of the Audit Committee, management is committed to the planning and implementing of these remediation actions to address the material weaknesses identified, as well as to foster continuous improvement in the Company's internal controls.***   The Company has implemented or is in the process of implementing various initiatives intended to address the identified material weaknesses and strengthen our overall internal control environment. In this regard, some of our key remedial initiatives include:

- *Executive Management Communications to Reinforce Compliance* - The Company's Chief Executive Officer and Chief Financial Officer, at the direction of the Company's Board of Directors, have in communications to personnel

reinforced the importance of adherence to the Company's policies and procedures regarding ethics and compliance and the importance of identifying misconduct and raising and communicating concerns.

- *Changes to Our Executive Management and Sales Personnel* - The Company has hired new personnel, who have enabled improved lines of communication across business functions and increased expertise.

- *Training Practices* - The Company has initiated development of a comprehensive training program relating to revenue recognition and contract review.

- *Credit Policies and Procedures* - The Company has evaluated its practices regarding extension of credit to customers and evaluation of customer creditworthiness and has begun implementing improvements in those practices.

- *Revenue Recognition Policies and Procedures* - The Company has evaluated its revenue recognition policies and procedures and has begun implementing improvements, including:

   (i)     the development of more comprehensive revenue recognition policies and improved procedures to ensure that such policies are understood and consistently applied;

   (ii)    better communication among functions involved in the sales process, including credit, accounting, sales, and sales operations;

   (iii)   increased standardization of contract documentation and revenue analyses for individual transactions, including increased oversight of revenue opportunities and contract review by personnel with the requisite accounting knowledge;

   (iv)    the development of a more comprehensive review process for, and monitoring controls over, customer contracts to ensure accurate revenue recognition, and the preparation of accounting memoranda to document the foregoing;

   (v)     the development of more comprehensive policies and procedures for product shipment and delivery documentation;

   (vi)    the adoption of enhancements of policies and procedures for approval of non-standard revenue arrangements with reseller and distributor customers; and

   (vii)   the adoption of revised documentation, including the Company's sales quotations, to identify additional information relevant to revenue recognition.

- *Implementation and Enhancement of Entity Level Controls* - The Company intends to implement additional controls in its quarterly/annual financial reporting process, including enhanced sub-certifications by all sales personnel and with specific documentation related to the identification of nonstandard revenue arrangements. The Company also intends to enhance its insider trading policy and related communications to employees.

307.    The breadth of A10's extensive internal control remediation program underscores the depth and severity of the material breakdown in internal controls during the Class Period.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**E.**     **A10's Code of Business Conduct and Ethics and Financial Reporting Obligations of Senior Officers**

308.    During the Class Period, A10 maintained a Code of Business Conduct and Ethics, effective as of March 4, 2014 (the "Code").   The Code applied to all directors, officers, and employees of A10 and its subsidiaries.   The Code was designed to guide "honest and ethical" conduct in the course of A10 business, including *inter alia*, "full, fair, accurate, timely and understandable disclosure in reports and documents we file with or submit to the U.S. Securities and Exchange Commission and in our other public communications."

309.    The Code's "Financial Reporting" provided specific guidance regarding for A10's employees, officers and directors concerning their financial reporting obligations:

**Overview**

As a public Company, we are required to follow strict accounting principles and standards, to report financial information accurately and completely in accordance with these principles and standards, and to have appropriate internal controls and procedures to ensure that our accounting and financial reporting complies with law. ***The integrity of our financial transactions and records is critical to the operation of our business and is a key factor in maintaining the confidence and trust of our employees, security holders and other stakeholders.***

310.    The Code's "Financial Reporting" guidance also provided specific guidance for emphasizing the importance of complying with applicable rules and control procedures in addition to the accuracy of records and reports – while highlighting the specific application to senior executives and those responsible for discharging the Company's financial reporting obligations:

**Compliance with rules, controls and procedures**

It is important that all transactions are properly recorded, classified and summarized in our financial statements, books and records in accordance with our policies, controls and procedures, as well as all generally accepted accounting principles, standards, laws, rules and regulations for accounting and financial reporting. If you have responsibility for or any involvement in financial reporting or accounting, you should have an appropriate understanding of, and you should seek in good faith to adhere to, relevant accounting and financial reporting principles, standards, laws, rules and regulations and the Company's financial and accounting policies, controls and procedures. *If you are a senior officer, you should seek to ensure that the internal controls and procedures in your business area are in place, understood and followed.*

**Accuracy of records and reports**

It is important that those who rely on records and reports—managers and other decision makers, creditors, customers and auditors—have complete, accurate and

timely information. False, misleading or incomplete information undermines the Company's ability to make good decisions about resources, employees and programs and may, in some cases, result in violations of law. ***Anyone involved in preparing financial or accounting records or reports, including financial statements and schedules, must be diligent in assuring that those records and reports are complete, accurate and timely. Anyone representing or certifying as to the accuracy of such records and reports should make an inquiry or review adequate to establish a good faith belief in their accuracy.***

Even if you are not directly involved in financial reporting or accounting, you are likely involved with financial records or reports of some kind—a voucher, time sheet, invoice or expense report. In addition, most employees have involvement with product, marketing or administrative activities, or performance evaluations, which can affect our reported financial condition or results. ***Therefore, the Company expects you, regardless of whether you are otherwise required to be familiar with finance or accounting matters, to use all reasonable efforts to ensure that every business record or report with which you deal is accurate, complete and reliable.***

311.    The Code also specifically prohibited the intentional misrepresentation of the financial performance and any attempt to compromise the integrity of the Company's reports, records, policies and procedures.    This included specific prohibitions relating to the misclassification and timing of revenue recognition:

- enter into any transaction or agreement that accelerates, postpones or ***otherwise manipulates the accurate and timely recording of revenues or expenses***;
- ***intentionally misclassify transactions*** as to accounts, business units or ***accounting periods***,

312.    The Code further created an affirmative "[o]bligation to investigate and report potential violations," including *inter alia*, "financial results that seem inconsistent with underlying business performance;" "transactions that appear inconsistent with good business economics;" and "the absence or weakness of processes or controls."

313.    Relatedly, the Code imposed specific responsibilities on the CEO and senior financial officers such as the CFO and the Controller with respect to their financial reporting obligations.

The Audit Committee plays an important role in ensuring the integrity of our public reports.  If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should notify the Audit Committee of the Board.  ***In particular, the CEO and senior financial officers such as the CFO and the Controller should promptly bring to the attention of the Audit Committee any information of which he or she may become aware concerning***, for example:

• the accuracy of material disclosures made by the Company in its public filings;

• material weaknesses or significant deficiencies in internal control over financial reporting;

• any evidence of fraud that involves an employee who has a significant role in the Company's financial reporting, disclosures or internal controls or procedures; or

• any evidence of a material violation of the policies in this Code regarding financial reporting

### F.    Corporate Scienter

314.    Individual Defendants Chen, Straughn, Natarajan, and Constantino were among a handful of employees responsible for signing financial statements.  The Individual Defendants acted with apparent authority to speak on behalf of the Company and their statements were made with the imprimatur of the Company that selected them to speak on its behalf.  Moreover, Defendant Chen, as CEO, and Defendants Straughn, Natarajan, and Constantino, as CFO and Controller/Interim CFO, were highly involved in the preparation, review, finalization, and issuance of the Company's financial statements, and investors relied on their honesty and integrity.

315.    Based on the foregoing, the Individual Defendants' actions and scienter are imputable to A10 at all times during the Class Period.  Each of the Individual Defendants acted as an agent of A10, both with respect to the SEC filings that they signed and also with respect to the SEC filings and earnings releases that they assisted in preparing and/or that he oversaw or participated in the accounting for.  Therefore, the Individual Defendants' states of mind are imputable to A10 for all of the challenged statements in this Complaint, whether or not he personally signed those statements.

### X.    POST-CLASS PERIOD DISCLSOURES

316.    On July 2, 2018, A10 issued a Form 8-K announcing that the Audit Committee of its Board of Directors has completed the internal investigation previously disclosed on January 30, 2018.  Specifically, the Company disclosed that the Audit Committee identified accounting errors relating to the premature recognition of revenue on certain transactions due to the incorrect assessment of resellers' ability or intent to pay the company before they received a purchase order

or payment from their end customers.  The Company also disclosed that it was evaluating the impact of these errors on its internal control over financial reporting and disclosure controls and procedures, and expected to report one or more material weaknesses in internal control over financial reporting related to this matter and that its disclosure controls and procedures were not effective.  In addition, the Company disclosed that previously issued financial statements and information contained in its Annual Report on Form 10-K for the fiscal year ended December 31, 2016, and its condensed consolidated financial statements contained in its Quarterly Report on Forms 10-Q for the quarters ended September 30, 2016 and March 31, 2017 should no longer be relied upon and should be restated.

317.   On August 29, 2018, A10 issued the 2017 Form 10-K, approximately seven months after the Company announced that the filing would be delayed and five months after it was due.  A number of the key disclosures provided in the 2017 Form 10-K are summarized at ¶¶79-114, *supra*. Selected excerpts from the 2017 Form 10-K are attached hereto as Exhibit A to this Complaint and are incorporated by reference, as if fully stated herein.  The Restatement 10-K further disclosed that in March 2018, the SEC began a private investigation into any securities laws violations by A10 or persons currently or formerly affiliated with A10.  The Company stated that it was cooperating with the SEC investigation, but was "unable to predict the duration, scope or outcome of the investigation, but an adverse outcome is reasonably possible."

318.   On the following day, the Company issued a press release regarding preliminary financial results for the quarter and six months ended June 30, 2018.  The Company also announced that it planned to file quarterly reports for Q1'18 and Q2'18 during September 2018.

319.   On April 3, 2018, the Company received a notice form the NYSE indicating that it was not in compliance with the NYSE's listing requirements under the timely filing criteria outlined in Section 802.01E of the NYSE Listed Company Manual as a result of its delay in filing A10's Annual Report on Form 10-K.  Even though A10 filed its Form 10-K within the NYSE's six-month period to cure filing deficiencies, the Company's failure to file a Quarterly Report on Form 10-Q for the quarter ended June 30, 2018 subjects it to the risk of delisting.

320.    On September 24, 2018, the Company filed its Form 10-Q for Q1'18.   As of October 4, 2018, the Company still has not filed its Form 10-Q for Q2'18.   The Q1'18 10-Q indicated that the Company is still cooperating with the SEC investigation into any securities laws violations by A10 or persons currently or formerly affiliated with A10.

## XI.    CLASS ACTION ALLEGATIONS

321.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities that acquired the common stock of A10 during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class").   Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

322.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, A10 stock was actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.   Millions of A10 shares were traded publicly during the Class Period on the NYSE. As of December 31, 2017, the Company had 71.7 million shares outstanding, and during the Class Period, average daily trading volume in A10 shares was approximately 481,390 shares during the Class Period.   Record owners and other members of the Class may be identified from records maintained by A10 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

323.    Plaintiffs' claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws that is complained of herein.   Further, Plaintiffs will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation.

324.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

a)      whether the federal securities laws were violated by Defendants' conduct alleged herein;

b)      whether statements made by Defendants to the investing public during the Class Period omitted or misrepresented material facts about the business, operations, results of operations and prospects of A10;

c)      whether Defendants acted with scienter; and

d)      to what extent Class members have sustained damages and the proper measure of damages.

325.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.   Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for many of the Class members to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## XII.    APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

326.    The market for A10 common stock was open, well-developed, and efficient at all relevant times.   As a result of Defendants' materially false or misleading statements and material omissions, the Company's stock traded at artificially inflated prices during the Class Period.   On October 3, 2016, the Company's stock closed at a Class Period high of $10.77 per share.   Plaintiffs and other members of the Class purchased or otherwise acquired the Company's shares relying on the integrity of the market price of such securities and on publicly available market information relating to A10, and have been damaged thereby.

327.    During the Class Period, the artificial inflation of the value of A10's shares was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing

the damages sustained by Plaintiffs and other Class members.  As alleged herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's stock to be artificially inflated at all relevant times.  When the truth was disclosed, it drove down the value of the Company's stock, causing Plaintiffs and other Class members that had purchased the stock at artificially inflated prices to be damaged as a result.

328.    At all relevant times, the market for A10 stock was efficient for the following reasons, among others:

a)      A10's stock met the requirements for listing, and it was listed and actively traded on the NYSE, a highly efficient market;

b)      A10 had 71.7 million shares of common stock outstanding (as of September 17, 2018) and, during the Class Period, an average daily trading of 481,390 shares per day;

c)      As a regulated issuer, A10 filed periodic public reports with the SEC and/or the NYSE;

d)      A10 regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

e)      A10 was followed by securities analysts employed by brokerage firms – including, but not limited to, (1) the Buckingham Research Group, (2) Dougherty & Company, (3) J.P. Morgan, (4) Keybanc Capital Markets, (5) Morgan Stanley, and (6) Oppenheimer – who wrote reports about the Company, which reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

329.    Based on the foregoing, during the Class Period, the market for A10 stock promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of A10 stock, as is further and concretely evidenced by the market reactions to A10's announcements and disclosures of July 13, 2017, January 16, 2018, and January

30, 2018.  Under these circumstances, the market for A10 stock was efficient during the Class Period and, therefore, investors' purchases of A10 stock at artificially inflated market prices give rise to a class-wide presumption of reliance under the fraud-on-the-market doctrine.

330.    In the alternative, the *Affiliated Ute* presumption of reliance applies to the extent that Defendants' statements during the Class Period involved omissions of material facts.

## XIII.    NO SAFE HARBOR

331.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein.  To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## XIV.    COUNTS

### FIRST COUNT
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

332.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein. This claim is asserted against all Defendants.

333.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase A10 stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

334.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for A10 stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

335.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about A10's business, operations, management, and prospects, as specified herein.

336.   Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of A10's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements about A10 and its operations and financial results, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

337.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the

Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

338.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing A10's business, operations, management and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by misstatements throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

339.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of A10 stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired A10 stock during the Class Period at artificially high prices and were damaged thereby.

340.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth about A10's collectibility concerns that gave rise to revenue recognition issues, specifically that reseller's or distributor's payment was contingent on resale and/or that transactions included extended payment terms

beyond the Company's customary terms, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their A10 stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

341.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

342.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND COUNT
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

343.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

344.   The Individual Defendants acted as controlling persons of A10 within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

345.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

346.    As set forth above, A10 and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b)    Awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d)    Such other and further relief as the Court may deem just and proper.

## XVI.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

1    DATED: October 5, 2018          KIRBY McINERNEY LLP

2

*/s/ Robert J. Gralewski, Jr.*
Robert J. Gralewski, Jr. (#196410)
3                                  600 B Street, Suite 1900
San Diego, CA 92101
4                                  Telephone: (619) 398-4340
Email: bgralewski@kmllp.com
5

6                                  - and -

7                                  Daniel Hume (admitted *pro hac vice*)
Ira M. Press
8                                  Thomas W. Elrod (admitted *pro hac vice*)
825 Third Avenue, 16th Floor
9                                  New York, NY 10022
Telephone: (212) 371-6600
10                                 Email: dhume@kmllp.com
ipress@kmllp.com
11                                 telrod@kmllp.com
12

13                                 BRAGAR EAGEL & SQUIRE, P.C.
Lawrence P. Eagel (admitted *pro hac vice*)
14                                 Marion C. Passmore (#228474)
Melissa A. Fortunato (#319767)
15                                 885 Third Avenue, Suite 3040
New York, NY 10022
16                                 Telephone: (212) 308-5858
Email: eagel@bespc.com
17                                 passmore@bespc.com
fortunato@bespc.com
18

19                                 *Counsel for Lead Plaintiff Eric Blackwell and the*
*Proposed Class*
20

21                                 GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy (#134180)
22                                 Robert V. Prongay (#270796)
Christopher R. Fallon (#235684)
23                                 1925 Century Park East, Suite 2100
Los Angeles, CA 90067
24                                 Telephone: (310) 201-9150
Email: lglancy@glancylaw.com
25                                 rprongay@glancylaw.com
cfallon@glancylaw.com
26

27                                 *Counsel for Additional Plaintiff Robert Kraszewski*

28